[No. D049623. Fourth Dist., Div. One. Dec. 15, 2008.]

CARDINAL HEALTH 301, INC., Plaintiff and Appellant, v.
TYCO ELECTRONICS CORPORATION et al., Defendants and Appellants;
REMEC, INC., Defendant and Respondent.

120

**COUNSEL**

Rutan & Tucker, Richard K. Howell, Steven J. Goon, Treg A. Julander and Ako S. Williams for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Peter L. Garchie, Ernest Slome, Raul L. Martinez and Jeffry A. Miller for Defendant and Appellant Tyco Electronics Corporation.

Niddrie, Fish & Buchanan, Michael H. Fish; Thompson & Alessio, Kris P. Thompson, Jeffrey K. Miyamoto and Christina G. Bernstein for Defendant and Appellant Thomas & Betts Corporation.

DLA Piper US, Michael S. Tracy, Matthew B. Dart and Stanley J. Panikowski for Defendant and Respondent.

**OPINION**

**HALLER, Acting P. J.**—Plaintiff Cardinal Health 301, Inc. (Cardinal), developed the MedStation 2000, a machine used by hospitals to supply patient medication to medical personnel. Defendants Tyco Electronics Corporation (Tyco) and Thomas & Betts Corporation (T&B) manufactured certain electrical parts for the MedStation, known as spring probe connectors. After Cardinal sold numerous MedStations to hospitals, the machines did not always work properly, and testing showed the problems could be attributed to defects in the spring probe connector.

Cardinal then sued Tyco and T&B claiming the defects in the spring probe connectors required Cardinal to replace the connectors and thus caused Cardinal to suffer damages. After a six-week trial, the jury was asked to decide whether Cardinal proved three causes of action against T&B: (1) breach of contract; (2) breach of an express warranty; and (3) breach of the implied warranty of fitness for a particular purpose. The jury was also asked to decide one cause of action against Tyco: breach of the implied warranty of fitness for a particular purpose. The jury returned verdicts finding in Cardinal's favor on each of these causes of action. The jury awarded approximately $12.2 million against Tyco, consisting of $6.7 million in past damages and $5.5 million in future damages. The jury awarded $451,351.02 against T&B, consisting only of past damages.

Tyco and T&B appeal.

Tyco contends the judgment must be reversed because (1) there was no privity between Tyco and Cardinal supporting an implied warranty cause of

action and/or the court improperly instructed on the privity requirement; and (2) insufficient evidence supported the judgment on several elements of the warranty cause of action, including causation and damages. We reject these arguments, except we conclude the future damages award is unsupported, and strike that portion of the damages award from the judgment. We affirm the remaining portions of the judgment against Tyco.

As to T&B, we reverse the judgment based on two independent grounds: (1) Cardinal filed the action against T&B beyond the applicable limitations period; and (2) Cardinal failed to comply with statutory notice requirements with respect to T&B.

Cardinal filed a protective cross-appeal against Tyco and T&B. Because we affirm the Tyco judgment except for the future damages amount, it is not necessary to reach Cardinal's arguments on the cross-appeal regarding Tyco. With respect to T&B, we conclude Cardinal's arguments in the cross-appeal are without merit.

In its complaint, Cardinal also sued Remec, Inc., which had a contractual relationship with Cardinal for the assembly of the MedStation circuit boards. During trial, the court granted Remec's motion for nonsuit. Cardinal appealed this ruling, but in a separate order we dismissed the appeal based on a finding the appeal was untimely. Cardinal now appeals the order awarding Remec costs. We affirm the cost award.

## FACTUAL AND PROCEDURAL SUMMARY

In about 1998, Cardinal, a health care products company, began to develop an automated medication dispensing machine for hospital use.[1] Although hospitals had previously used medication dispensing machines, Cardinal wanted to develop a new type of delivery system that had removable pockets to permit the pharmacy department to fill the pockets with medication, and then deliver the secure pockets to the machine located on a patient floor. The purpose of the machine was to safeguard and protect the administration of prescription medicines, ensuring each patient was given the proper medication and providing a computerized medication inventory system.

As developed, the MedStation resembles a large cabinet, with up to eight drawers that slide open. Inside each drawer is a circuit board called a MOAB. Attached to each MOAB are the 30 removable plastic pockets, called "Cubie

---

[1] Cardinal was previously known as Pyxis. We shall refer to both entities as "Cardinal."

pockets" or "Cubies," that hold medication. Each Cubie pocket has a latch and a lid. The MedStation machines are generally located on nursing floors. The hospital pharmacy fills each Cubie pocket with a particular type of medication, and the pocket is then brought to the nursing floor and placed in the machine. A nurse can then input a command on the MedStation's keyboard, and a Cubie lid will open, allowing the nurse to access the proper medication. The Cubie has a memory chip that can be programmed at a remote site.

To make this system work, Cardinal needed a special electrical connection between the Cubie and the MOAB. The Cubie pocket was designed to be repeatedly removed from, and returned to, the MedStation, and therefore the connection between the removable Cubie pocket and the circuit board had to be capable of "mating" and "demating" thousands of times.

Because Cardinal did not have experience in designing or manufacturing electrical connectors, Cardinal contacted T&B, which had substantial expertise in this field, to discuss the possibility of T&B supplying the electrical connector attached to the MOAB. In its initial dealings with T&B, Cardinal described the MedStation's functions and characteristics and showed T&B the prototype MedStation, the Cubie pocket, and the MOAB.

T&B then presented Cardinal with a proposed design drawing for a spring probe connector (the stationary connector that would be attached to the MOAB), based on Cardinal's stated requirements. This spring probe connector contained five small pins. Each pin consisted of a barrel, a plunger (fitting within the barrel) and a spring located at the base of the plunger. T&B designed the connector so that when the Cubie pocket is pushed down into the MOAB and locked into place, the springs inside each pin depress yet still maintain physical contact (and therefore an electrical connection) with the Cubie pocket. Because each MOAB contains approximately 30 Cubie pockets and each spring probe connector has five pins, there are approximately 150 connector pins on each MOAB.

In December 1998, Cardinal and T&B entered into a purchase agreement, known as the "1998 Scheduling Agreement," for T&B to sell one million spring probe connectors to Cardinal. The agreed price was $1.17 for each connector. T&B agreed that the spring probe connectors would be "free of defects in material and workmanship." The scheduling agreement contained detailed drawings of the agreed-upon connector design, and included written product requirements. These written requirements included (1) "mechanical life 50,000 cycles"; (2) "materials: [¶] contact: copper alloy, gold plated (30 micro inches min in contact area, 20 micro inches min in solder area)

insulator: thermoplastic polyester"; (3) "mates with B121548 mobile connector"; (4) "current rating: 1 amp"; and (5) "maximum contact resistance: 100m ohms." (Capitalization omitted.) When the parties entered into the scheduling agreement, T&B understood that Cardinal intended to retain a manufacturer to assemble the MOAB's, and T&B expressly agreed to "honor [the $1.17 price] for the . . . authorized contract manufacturer chosen . . . ." (Capitalization omitted.)

After successfully testing various prototypes, T&B began delivering the spring probe connectors to Cardinal. T&B eventually delivered 85,000 connectors directly to Cardinal.

In approximately August 1999, Cardinal selected Remec as the entity that would manufacture and assemble the MOAB's, including attaching the T&B spring probe connectors to the MOAB's. Cardinal then "cancelled" its agreement with T&B, and entered into a new agreement with Remec for the supply of the completed MOAB's. Remec's function was to purchase all of the raw materials (including the spring probe connectors) and put the product together for Cardinal, consistent with Cardinal's specifications. Remec then entered into a separate agreement with T&B for the supply of the remaining approximately 900,000 spring probe connectors. After numerous product tests, in about May 2000, Cardinal began selling the MedStation machines to hospitals for $65,000 each.

About the same time, in May 2000, Tyco purchased the electrical connector division of T&B. Cardinal learned of this fact when Brian Sherman, a Tyco employee formerly employed by T&B, informed Lisa Files, a Cardinal employee responsible for the Cubie product, that the acquisition had occurred and that "nothing changes until we tell you further." Files understood that she was to direct all of her inquires to Tyco personnel. Cardinal's relationship with Tyco remained the same as its relationship with T&B before the acquisition. T&B continued to exist, manufacturing and selling other electrical products.

Shortly after the acquisition, Tyco entered into an agreement with Remec for the sale of the spring probe connectors. Remec purchased the spring probe connectors directly from Tyco, and then mounted them on the MOAB's, and delivered the product to Cardinal. Tyco adopted all of the specifications and design drawings that had been negotiated between Cardinal and T&B. Tyco manufactured the connectors in the same manner as had T&B, used the custom-made tools T&B had created for the manufacturing process, and charged the same price.

By late 2000 or early 2001, hospitals began notifying Cardinal they were experiencing problems with the Cubies. A Cardinal engineer visited about 12 hospitals throughout the country, and observed numerous problems. Most of the problems were readily fixable, but one of the problems could not be explained—the MedStation computer would sometimes fail to detect the presence of the Cubie. When the Cubie could not be detected, the lid to the Cubie could not be opened and therefore the patient medication could not be promptly accessed. Another Cardinal employee also observed similar problems with the Cubies at other hospitals. Remec also reported its functional testing showed "some percentage" of Cubie failures. The problem was referred to as an "intermittent communication issue" because the problem would manifest randomly; sometimes the Cubie pockets would open and other times they would not.

Cardinal thereafter began to investigate possible causes for this problem, including computer software issues. After a period of testing, Cardinal ruled out other possible causes and believed the problem was caused by the spring probe connector. Shortly after making this assessment, in August 2001, Cardinal informed Tyco that the MedStation units were having intermittency problems and that Cardinal believed the problem was caused by the spring probe connectors. Tyco nonetheless continued to supply the spring probe connectors and Remec continued to install them on the MOAB's, and Cardinal continued to sell the MedStations to hospitals.

Cardinal and Tyco then began efforts to find the root cause of the problem, and to identify another type of connector that would work better. The investigation continued for about 15 months until almost the end of 2002. As part of this investigation, Tyco and Cardinal conducted weekly teleconferences, exchanged hundreds of e-mail messages, and participated in numerous face-to-face meetings. In September 2001, the Tyco product engineering manager responsible for the spring probe connectors (Robert Bendorf), sent an e-mail noting that the connector design "does not appear to perform well in the application" and that "our customer [Cardinal] is concerned with intermittences and opens." Bendorf stated he was "looking for a high reliability contact to replace the former T&B [spring probe connector]."

At about this same time, Cardinal began requiring Remec to conduct additional tests on the MOAB's and Cubies before delivering the MedStations to hospitals. These tests would sometimes detect communication failures between the Cubie pocket and the MOAB. Upon detecting a connector problem, Remec would identify the connector that had failed and would rework it and replace the connector. Cardinal also required Tyco to conduct additional testing before the connectors were sent to Remec, and Tyco never suggested these measures were unnecessary.

In 2002, Remec commissioned an outside lab, PhotoMetrics, Inc., to investigate the root cause of the electrical problem. Paul Reidel, a PhotoMetrics metallurgist, performed the analysis. Remec sent Reidel one new connector and one failed connector with one pin that was intermittently "open." Loss of electrical signal or contact is called an "open" where no current flows. After cutting the pin, Reidel found that it had "odd colorations" with "some real visible thickness" and "heavy deposits" of contaminants. Reidel also saw that there was no gold plating in the lower region of the connectors near the bottom of the barrel. These observations revealed that the internal surfaces of the barrels were corroded from the lack of gold plating and the corrosion was the cause of the intermittent electrical opens. In May 2002, PhotoMetrics prepared a report detailing its findings, and this report was forwarded to Remec and Cardinal.

Based on the report, Cardinal concluded the intermittent electrical problem was caused by insufficient gold plating on the bottom portions of the pins, making them prone to internal corrosion and electrical connection failures. Cardinal sent a copy of the PhotoMetrics report to Tyco. Tyco never indicated any disagreement with the report findings. Instead, Tyco suggested that a design change should be made because the contamination of the barrel appeared to be related to plating.

At that point, Cardinal understood that the connectors were defective because they did not effectively transmit electrical current and would continue to cause intermittent problems with Cubie openings. To deal with this problem, Cardinal decided to replace the connectors and contracted with a different company for the manufacture of a connector with a new design to use as a replacement connector. Cardinal also retained Remec to install the replacement connectors on the MOAB's. However, for practical reasons and to mitigate the costs, Cardinal decided that it would not replace all of the Tyco/T&B connectors with this new connector. Instead, it decided it would replace only those spring probe connectors on MOAB's that had a "failure" rate of 1 percent or higher. A MOAB "fails" when in response to a proper command, a Cubie pocket does not open. The failure rate was determined by software attached to MedStation units. A 1 percent failure rate means that for every 100 times a command was sent for the Cubie pocket lid to open, it did not open one time.

On November 16, 2004, Cardinal filed an action against Tyco, T&B and Remec to recover its costs for replacing the spring probe connectors on the MOAB's. As amended, the complaint alleged breach of contract, breach of implied covenant of good faith and fair dealing, and breach of express and implied warranties. Before trial, the court granted Tyco's summary adjudication motion on Cardinal's contract claims, finding the undisputed evidence

established there was no oral or written contract between Tyco and Cardinal for the sale of the connectors (because Cardinal had contracted directly with Remec, which contracted with Tyco). But the court denied Tyco's summary adjudication motion on Cardinal's express and implied warranty claims, finding the existence of disputed factual issues.

During trial, the court granted Remec's nonsuit motion as to all causes of action, essentially concluding Cardinal did not present evidence that Remec provided any form of warranty as to the quality of the spring probe connectors. The trial court also granted Tyco's motion for nonsuit on Cardinal's express warranty cause of action, stating there was "no evidence [of] there being any basis of the bargain, negotiation, express warranties between Tyco and Cardinal such as to create any grounds for a cause of action for express warranty." The court later dismissed Cardinal's implied warranty of merchantability claims, finding no evidence to support the claims.

Thus, after these rulings, one cause of action remained against Tyco: breach of the implied warranty of fitness for a particular purpose. Three causes of action remained against T&B: breach of contract, breach of express warranty, and breach of the implied warranty of fitness for a particular purpose. On the express warranty cause of action, Cardinal claimed T&B had made three express warranties in the 1998 Scheduling Agreement: (1) the connectors would be "free of defects in material and workmanship"; (2) "[t]he contact would be copper alloy, gold plated"; and (3) "[t]he mechanical life would be 50,000 cycles." On the implied warranty claims, Cardinal asserted that the spring probe connectors were not suitable for the MedStations because they did not provide a reliable electrical connection.

At the lengthy trial, Cardinal presented numerous witnesses and documentary evidence in an attempt to establish the spring probe connectors were defective, and that this defect caused many of the MedStations to fail to operate properly. Defendants presented opposing evidence, asserting numerous factual arguments, including that Cardinal was responsible for the design of the connectors and Cardinal's failure to produce any of its customers as witnesses to establish the defective condition of the machines showed that Cardinal's true purpose in replacing the spring probe connectors was to upgrade the machines, rather than to repair a defect.

By the time of trial, Cardinal had replaced the spring probe connectors on 29,112 MOAB's, at a total cost of $7,919,895. With respect to these replacement costs, Cardinal requested the jury to award it refurbishment costs

($4,955,100) plus service costs ($2,209,202), totaling $7,164,302.[2] Cardinal argued each defendant should be responsible for this amount in proportion to the amount of spring probe connectors that it had supplied for the MedStations. Thus, because Tyco had sold 93.7 percent of the connectors, Cardinal asserted that Tyco should be held responsible for 93.7 percent of this cost, or about $6,712,951. Because T&B had sold 6.3 percent of the spring probe connectors, Cardinal claimed that T&B was responsible for 6.3 percent of the replacement costs, or about $451,351.

Cardinal also asked the jury to award it compensation for its future costs with respect to MOAB's that had not yet been returned. With respect to this figure, Cardinal presented evidence that approximately 21,646 MOAB's with Tyco/T&B spring probe connectors remained in use by hospitals and presented evidence of the average refurbishment and service costs for each MOAB. According to Cardinal's accounting expert, if *all* of the spring probe connectors on the remaining MedStations were replaced, the present value of the recoverable cost would be $5,916,526 ($3,791,547 for refurbishment plus $2,124,979 in service costs).

In special verdicts, the jury found in favor of Cardinal on each of its causes of action against T&B and Tyco. With respect to damages, the jury awarded Cardinal all of its claimed *past* damages for replacing the spring probe connectors ($7,164,302). The jury's damages awards indicate it agreed with Cardinal's arguments that Tyco was responsible for 93.7 percent of this amount (or $6,712,950.98), and T&B was responsible for 6.3 percent of this amount (or $451,351.02).

With respect to future damages, the jury awarded Cardinal $5,543,784.87 against Tyco, which is approximately 93.7 percent of the replacement and service costs of the spring probe connectors on *all* of the MOAB's with spring probe connectors that remain with the hospitals. The jury did not award Cardinal any future damages against T&B.

## DISCUSSION

## T&B APPEAL

### I. *Statute of Limitations*

T&B contends the court erred in denying its motions for nonsuit and directed verdict based on its argument that the lawsuit was barred by the

---

[2] Cardinal also presented evidence of additional costs, including freight, handling, purchasing, and personnel, but the court ruled these costs were not recoverable. The claimed amounts also did not include the refurbishment of MOAB's that were damaged on return (about 9 percent of the total returned MOAB's).

four-year limitations period of California Uniform Commercial Code section 2725.[3] This argument is meritorious.

## A. *Breach of Express Warranty Claim*

### 1. *Overview*

 California has adopted the Uniform Commercial Code statute of limitations rule for breach of warranty causes of action. (§ 2725.) Section 2725 provides in relevant part: "(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. . . . [¶] (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

In 1967, the Legislature adopted the Uniform Commercial Code statute, rejecting its earlier view that the statute of limitations is "purely a local problem." (Cal. Code com., 23A pt. 2 West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 2725, p. 154.) The Legislature sought to promote "uniformity" and to " 'eliminate jurisdictional variations and provide needed relief for concerns doing business on a nationwide scale.' " (*Ibid.*) The four-year rule was selected by the Uniform Commercial Code drafters "as the most appropriate to modern business practice," recognizing "[t]his is within the normal commercial record keeping period." (U. Com. Code com., 23A pt. 2 West's Ann. Cal. U. Com. Code, *supra*, foll. § 2725, p. 155.)

Thus, under section 2725, the general limitations rule for a breach of warranty cause of action *is* four years from the date the goods are delivered (regardless of the date the buyer discovers the breach), *unless* the "warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance . . . ." (§ 2725, subd. (2).) If the exception applies, the accrual date is the time the breach "is or should have been discovered." (*Ibid.*)

In this case, T&B sold its entire electronic connector business to Tyco in May 2000. At that time, Tyco took over T&B's obligations for supplying the spring probe connectors. The last time the T&B spring probe connectors were delivered to Cardinal was in July or August 2000. However, Cardinal did not file the action against T&B until more than four years later, in November 2004.

---

[3] All unspecified statutory references are to the California Uniform Commercial Code.

At trial, T&B moved for a nonsuit and directed verdict on the basis that Cardinal's warranty claims were untimely as a matter of law under section 2725, subdivision (2). Cardinal opposed these motions, arguing that T&B's statement in the 1998 Scheduling Agreement that the spring probe connector would have a "mechanical life" of 50,000 cycles was a warranty extending to "future performance" and thus the discovery rule applied. The trial court agreed, and denied T&B's motions. As explained below, this ruling was erroneous. The 50,000-cycle warranty does not "explicitly extend to future performance" as that phrase has been defined in California and the majority of other jurisdictions interpreting the Uniform Commercial Code limitations period. These courts have held the "future performance" exception applies only when the future warranty refers to a specific future time period. The 50,000-cycle warranty does not satisfy this standard.

### 2. "Future Performance" Exception

■ The scope of the "future performance" exception has been the subject of numerous, and sometimes conflicting, decisions throughout the country. (See Annot., What Constitutes Warranty Explicitly Extending to "Future Performance" for Purposes of UCC § 2-725(2) (2000) 81 A.L.R.5th 483, 529–550; see also 1 White & Summers, Uniform Commercial Code (4th ed. 1995) § 11-9, pp. 607–611.) But the majority view is that the exception must be narrowly construed, and that it applies only when the seller has expressly agreed to warrant its product *for a specific and defined period of time.* (See *Western Recreational Vehicles v. Swift Adhesives* (9th Cir. 1994) 23 F.3d 1547, 1550; *Economy Housing Co. v. Continental Forest Products* (8th Cir. 1986) 805 F.2d 319, 321; *Standard Alliance Ind. v. Black Clawson Co.* (6th Cir. 1978) 587 F.2d 813, 820–821; *Coady v. Marvin Lumber and Cedar Co.* (D.Mass. 2001) 167 F.Supp.2d 166, 170; *Binkley Company v. Teledyne Mid-America Corporation* (E.D.Mo. 1971) 333 F.Supp. 1183, 1186; *Snyder v. Boston Whaler, Inc.* (W.D.Mich. 1994) 892 F.Supp. 955, 958; *Tolen v. A.H. Robins Co., Inc.* (N.D.Ind. 1983) 570 F.Supp. 1146, 1153–1154; *Patton v. Mack Trucks, Inc.* (1986) 360 Pa.Super. 1 [519 A.2d 959, 964].)

Seven years ago, a California Court of Appeal adopted this interpretation, stating, "[t]he vast majority of the courts . . . have concluded that the 'future performance' exception . . . applies only when the seller explicitly has agreed to warrant its product for a defined period of time. These courts reason that . . . section 2725 reflects the drafters' intention to establish a reasonable period of time—four years—beyond which sellers need not worry about stale warranty claims. [Citation.] Nonetheless, 'a buyer and a seller can freely negotiate to extend liability into the future . . . [but] an express warranty which makes no reference at all to any future date should not be allowed to extend past the limitations period. . . . [¶] [Thus, where] an express warranty

is made which extends for a specific period of time, i. e., one year, the policy reasons behind strict application of the limitations period do not apply. . . .' " (*Carrau v. Marvin Lumber & Cedar Co.* (2001) 93 Cal.App.4th 281, 291 [112 Cal.Rptr.2d 869] (*Carrau*).)

Quoting from 1 White and Summers, Uniform Commercial Code, *supra*, section 11-9, page 608, the *Carrau* court concluded " '[I]t should be clear that [section 2725's] extension of the normal warranty period does not occur in the usual case, even though all warranties in a sense apply to the future performance of goods.' " (*Carrau, supra,* 93 Cal.App.4th at p. 292.) The *Carrau* court applied these legal principles to reach its conclusion that the statute of limitations barred the warranty claims in the case which involved statements made in advertisements that were "general assertions as to the performance or durability of a product." (*Id.* at p. 291.)

Although this case presents a more specific warranty involving a promise that the product will work for "50,000 cycles," the principles expressed in *Carrau* compel a similar conclusion that this warranty does not fall within the "future performance" exception of section 2725, subdivision (2). The promise about the mechanical life of the spring probe connectors does not specify a date or time in the future, nor did the 50,000-cycle warranty pertain to a time period that could be determined by reference to an external source. Because a "mechanical cycle" means the number of times a particular Cubie is opened, both the beginning and end of the 50,000-cycle period were entirely within Cardinal's control. Both could occur within months of delivery, or—as Cardinal's counsel asserted during closing argument—may not occur for seven years or 10 years or 25 years. Cardinal presented evidence that the 50,000-cycle period was intended to coincide with the term of the typical MedStation lease, which was five years, and Cardinal's engineer character- ized the 50,000-cycle requirement as a durability requirement, rather than a warranty defining a specific time period. This evidence and argument reflect the vague and indefinite time period of the warranty.

Cardinal argues that T&B's 50,000-cycle warranty extended to future performance because the 50,000 cycles could not be performed at the time of delivery. However, the courts have rejected "the argument that a warranty necessarily extends to future performance merely because it contains prom- ises regarding the manner in which the goods will perform after tender of deliver[y]. The same argument applies to nearly all warranties. . . . The drafters of the Code could not have intended this result. . . . [P]arties must make a 'clear and unambiguous expression' of their intent to extend warran- ties to cover future performance. . . ." (*Patton v. Mack Trucks, Inc., supra,* 519 A.2d at p. 964.)

Considering the nature of this transaction and the fact that Cardinal and T&B are sophisticated commercial businesses, the parties knew how to draft plain language in an agreement to explicitly state a duration of the warranty to ensure the limitations period would extend beyond the four-year period if the breach was not discovered during that time. We necessarily assume that by failing to do so the parties did not intend to extend the limitations period. Given the lack of any specific basis to determine when the 50,000 cycles would occur, this warranty does not fall within the "future performance" exception of section 2725, subdivision (2).

In its appellate briefs, Cardinal suggests California courts do not strictly apply section 2725's statutory language, and instead the general rule in California is that the limitations period accrues for breach of warranty claims on the date the plaintiff reasonably discovers the breach. In support, Cardinal relies on decisions that predate California's 1967 enactment of the Uniform Commercial Code rule. (See, e.g., *Aced v. Hobbs-Sesack Plumbing Co.* (1961) 55 Cal.2d 573, 584 [12 Cal.Rptr. 257, 360 P.2d 897]; *Riesen v. Leeder* (1961) 193 Cal.App.2d 580, 582 [14 Cal.Rptr. 469]; *Southern Cal. Enterprises v. Walter & Co.* (1947) 78 Cal.App.2d 750, 754–756 [178 P.2d 785].) Those cases are inapplicable. Before the enactment of section 2725, California applied the discovery rule to determine the accrual date. When it adopted the Uniform Commercial Code version of the statute of limitations, it expressed the clear intent to follow the uniform rule which established tender of delivery as the accrual date, unless the plaintiff shows the warranty "explicitly extends to future performance." (§ 2725, subd. (2).)

Cardinal's additional reliance on several post-1967 decisions is unhelpful. (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112 [41 Cal.Rptr.2d 295] (*Jensen*); *Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205 [285 Cal.Rptr. 717] (*Krieger*); *Kaiser Cement & Gypsum Corp. v. Allis-Chalmers Mfg. Co.* (1973) 35 Cal.App.3d 948 [111 Cal.Rptr. 210] (*Kaiser*).)

In *Kaiser*, the parties entered into their contract in 1962, and the plaintiff did not discover the breach of implied warranty until 1966 or 1967. (*Kaiser, supra*, 35 Cal.App.3d at pp. 952, 961–962.) Section 2725 specifically provides that the section "does not apply to causes of action which have accrued before this code becomes effective [on January 1, 1968]." (§ 2725, subd. (4).) Thus, by its terms, section 2725's accrual-upon-tender rule was inapplicable in *Kaiser*. The *Kaiser* court relied solely on the pre-section-2725 decisions to conclude the statute of limitations did not begin to run until the breach could be reasonably discoverable by the purchaser. (*Kaiser, supra*, 35 Cal.App.3d at p. 960.)

■ The *Jensen* court likewise did not consider the issue whether the warranty was one that "explicitly extends to future performance." (*Jensen, supra*, 35 Cal.App.4th at pp. 132–134.) The action was filed within four years of the product delivery (*id.* at pp. 119–120), and therefore there was no need for the court to decide if the "future performance" exception applied (*id.* at pp. 132–134). Cases are not authority for propositions not considered therein. (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388 [53 Cal.Rptr.2d 81, 916 P.2d 476].)

*Krieger* is also inapposite in that it provides an example of a warranty that explicitly extends to future performance because it contains an express time limit. The automobile warranty stated the defendant would repair defects for 36 months or the first 36,000 miles, whichever occurs first—thus creating a defined three-year outer limit for the warranty period. (*Krieger, supra*, 234 Cal.App.3d at p. 216.) Moreover, the *Krieger* court focused on the promise to *repair* the vehicle during the warranty period. The court stated: "A promise to repair defects that occur during a future period is the very definition of express warranty of future performance . . . ." (*Id.* at p. 217.) Here, the warranty did not include a similar promise to repair.

■ We additionally conclude the "future performance" exception does not apply for a separate reason. (§ 2725, subd. (2).) For the exception to apply, the circumstances must be such that "discovery of the breach must await" the time of the promised future performance. (§ 2725, subd. (2); see *Wilson v. Hammer Holdings, Inc.* (1st Cir. 1988) 850 F.2d 3, 6.) Courts have interpreted this requirement to mean discovery of the breach "must '*necessarily* await' such future performance." (*Coady v. Marvin Lumber and Cedar Co., supra*, 167 F.Supp.2d at p. 170; see *Wilson, supra*, 850 F.2d at p. 6.) In this case, Cardinal could have discovered the defective pins soon after the machines were delivered, and thus would know they would not work as promised. The determinative fact, for purposes of the "must await" requirement, is that discovery is "*possible* prior to any specific future time." (*Coady, supra*, 167 F.Supp.2d at p. 171.) The undisputed circumstances in this case show that it was possible to test the machines and determine the defect prior to waiting 50,000 mechanical cycles.

### 3. *Tolling*

■ Cardinal alternatively contends the parties' repair efforts tolled the statute of limitations. Although a defendant's repair efforts can toll the section 2725 limitations period (§ 2725, subd. (4)), here there were no facts showing *T&B* engaged in any repair efforts. Although *Tyco* worked with Cardinal in an attempt to test the spring probe connectors and identify the MedStation problems, *T&B* was not involved in this activity. Tolling during a period of

repairs generally rests upon the same legal basis as does an estoppel to assert the statute of limitations, i.e., reliance by the plaintiff on the words or actions of the defendant that repairs will be made. (*A & B Painting & Drywall, Inc. v. Superior Court* (1994) 25 Cal.App.4th 349, 355 [30 Cal.Rptr.2d 418].) Accordingly, "[r]epair by third parties does not involve reliance upon the defendant in any way and furnishes no basis for tolling." (*Ibid.*)

Moreover, even if Cardinal could rely on Tyco's conduct to toll the limitations period as to T&B, there was no evidence that Tyco attempted to repair the connectors. Tyco assisted in Cardinal's efforts to determine why some connectors were failing. However, investigation is different from repair. Cardinal cites no authority, nor have we found any, holding that a limitations period is tolled while a defendant assists the plaintiff with an investigation as to the cause of the problems with the product.

## B. *Implied Warranty Claim*

■ Cardinal's implied warranty claim is also governed by section 2725, subdivision (2), and is barred for the same reason that the express warranty claim is barred. Because an implied warranty is one that arises by operation of law rather than by an express agreement of the parties, courts have consistently held it is not a warranty that "explicitly extends to future performance of the goods . . . ." (§ 2725, subd. (2); see, e.g., *Marvin Lumber and Cedar Co. v. PPG Industries* (8th Cir. 2000) 223 F.3d 873, 879; *Virtual Physical Center v. Phillips Medical System* (D.Md. 2007) 478 F.Supp.2d 840, 849; *Gail Frances, Inc. v. Alaska Diesel Elec., Inc.* (D.R.I. 1999) 62 F.Supp.2d 511, 517; *Hunter v. Woodburn Fertilizer, Inc.* (2006) 208 Ore.App. 242 [144 P.3d 970, 973]; *Kelleher v. Marvin Lumber & Cedar Co.* (2005) 152 N.H. 813 [891 A.2d 477, 509]; *Chopra v. Pella Window Corp.* (N.Y.App.Div. 2003) 2 A.D.3d 1087 [768 N.Y.S.2d 680, 681]; *Controlled Environ. Constr. v. Key Indus. Refrig.* (2003) 266 Neb. 927 [670 N.W.2d 771, 779]; *Carrell v. Masonite Corp.* (Ala. 2000) 775 So.2d 121, 124.)

## C. *Contract Claim*

Under the express terms of section 2725, the accrual-upon-tender rule applies only to breach of warranty claims. (§ 2725, subd. (2).) Cardinal thus argues that this rule is inapplicable to its breach of contract claim.

■ In determining the applicability of a particular statute of limitations, " 'courts will look to the nature of the rights sued upon rather than to the form of action . . . .' " (*Rivas v. Safety-Kleen Corp.* (2002) 98 Cal.App.4th 218, 229 [119 Cal.Rptr.2d 503].) Additionally, a specific statute of limitations will

prevail over a more general statute. (See *Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 859 [237 Cal.Rptr. 723].)

■ Under these principles, a breach of contract claim based solely on a breach of warranty is governed by section 2725, subdivision (2). (See *Schauer v. Mandarin Gems of Cal., Inc.* (2005) 125 Cal.App.4th 949, 958 [23 Cal.Rptr.3d 233] [applying statute of limitations for breach of warranty under § 2725 where "[p]laintiff's breach of contract claim is based on allegations of defendant's breach of express warranty . . . ."]; *Mills v. Forestex Co.* (2003) 108 Cal.App.4th 625, 642 [134 Cal.Rptr.2d 273]; see also *Krieger, supra,* 234 Cal.App.3d at p. 215, fn. 5; *Flagg Energy Development Corp. v. General Motors Corp.* (1998) 244 Conn. 126 [709 A.2d 1075, 1085].)

In this case, Cardinal's breach of contract claim was based solely on T&B's alleged breach of warranty. During closing arguments, Cardinal's attorney told the jury the factual basis for the breach of contract was the same as that for breach of warranty, and counsel earlier acknowledged that Cardinal's damages were the same regardless whether the jury returned a verdict for breach of warranty or breach of contract. On this record, we conclude the same limitations period applied for the breach of contract and breach of warranty causes of action. Thus, the contract claim was likewise untimely.

## II. *Statutory Notice*

We additionally conclude the judgment against T&B must be reversed because there was insufficient evidence showing Cardinal gave reasonable notice of the breach as required by section 2607, subdivision (3)(A).

■ To recover on a breach of warranty claim, "[t]he buyer must, within a reasonable time after he or she discovers or should have discovered any breach, notify the seller of breach or be barred from any remedy . . . ." (§ 2607, subd. (3)(A).) This notice requirement is designed to allow the seller the opportunity to repair the defective item, reduce damages, avoid defective products in the future, and negotiate settlements. (*Fieldstone Co. v. Briggs Plumbing Products, Inc.* (1997) 54 Cal.App.4th 357, 369–370 [62 Cal.Rptr.2d 701] (*Fieldstone*).) The notice also informs the seller of the need to preserve evidence and to be prepared to defend against the suit, and protects against stale claims. (*Ibid.*; see *Pollard v. Saxe & Yolles Dev. Co.* (1974) 12 Cal.3d 374, 380 [115 Cal.Rptr. 648, 525 P.2d 88]; 1 White & Summers, Uniform Commercial Code, *supra,* § 11-9, pp. 612–613.)

The buyer has the burden of proving reasonable notice. (*K & M Joint Venture v. Smith Intern., Inc.* (6th Cir. 1982) 669 F.2d 1106, 1111.) The

question whether notice was properly given must be "determined from the particular circumstances and, where but one inference can be drawn from undisputed facts, the issue may be determined as a matter of law." (*Fieldstone, supra,* 54 Cal.App.4th at p. 370.)

Cardinal concedes it did not notify T&B of the alleged breach of warranty until it filed the lawsuit. However, as it did at trial, Cardinal argues it gave T&B adequate notice of the breach when it sent *Tyco* a copy of the PhotoMetrics report in May 2002. Cardinal states it "reasonably believed" notice to Tyco in May 2002 was sufficient notice to T&B. In support, Cardinal relies on the following facts: (1) Cardinal was aware Tyco had purchased T&B's electronics division, but Cardinal did not know any of the details of the purchase; (2) after the T&B/Tyco sale, some T&B employees became Tyco employees; (3) during the transition period, a Tyco employee, who was formerly employed by T&B, told a Cardinal employee that "nothing changes until we tell you further"; (4) Tyco subsequently sent a letter to Cardinal explaining the sale (the letter was not introduced into evidence); and (5) a Cardinal employee testified that after reading the letter she understood that she was to "direct all of [her] inquiries to Tyco."

This evidence was insufficient to show that giving Tyco notice of the breach of warranty in May 2002 was sufficient to give notice to T&B. There was no evidence of any connection between T&B and Tyco in May 2002, almost two years after T&B had sold its electronics division to Tyco. There is no authority that notice to one company constitutes notice to another separate company merely because the second company acquired a portion of the first company's assets. There was no reasonable basis for Cardinal, a sophisticated commercial entity, to believe that Tyco had any legal obligation or would voluntarily assume the responsibility of informing T&B of the fact that Cardinal believed *T&B* had breached its warranty obligations and intended to hold *T&B* responsible for its damages. After Tyco's acquisition of its connector division, T&B continued to function. Before filing this lawsuit, Cardinal had more than two years to give T&B notice. Yet there is no evidence that Cardinal called T&B, wrote to T&B, tried to find T&B, or gave any other type of prelitigation notice to T&B.

Cardinal argues it would be "unreasonable" to charge Cardinal with knowledge of the inner workings of the Tyco/T&B acquisition. However, it was not necessary for Cardinal to understand the details of the acquisition to impose the obligation to notify T&B as a prerequisite to bringing an action for damages *against T&B.* It is undisputed Cardinal was aware that one corporation (Tyco) purchased the electronics division of another corporation (T&B), and that T&B continued to exist as a corporation after the sale. The fact that Cardinal's postsale dealings were only with Tyco did not relieve

Cardinal from notifying T&B of Cardinal's belief that T&B had breached its warranty. Giving notice of breach has nothing to do with the "inner workings" of Tyco's acquisition of T&B's electronics division.

Cardinal's reliance on *Johnson v. County of Fresno* (2003) 111 Cal.App.4th 1087 [4 Cal.Rptr.3d 475] is misplaced. In *Johnson*, Johnson sued Stribling, a county employee. (*Id.* at p. 1089.) As part of the Johnson-Stribling settlement, Stribling assigned his indemnification rights against the county to Johnson. (*Id.* at p. 1090.) Johnson then sued the county for indemnification. The county successfully demurred, arguing that Johnson could not sue the county in her own right. The appellate court reversed, explaining that an assignee of a claim " ' "stands in the shoes" of the assignor' " and "[o]nce a claim has been assigned, the assignee is the owner and has the right to sue on it." (*Id.* at pp. 1090, 1096.)

These principles are inapplicable here. The statutory notice issue does not involve an assigned claim. There is no evidence of any agreement between Tyco and T&B that Tyco agreed to receive notice on T&B's behalf, nor is there any reasonable basis for Cardinal to have concluded there was such an agreement. A statement that Cardinal should direct its inquiries to Tyco cannot be reasonably interpreted to mean that T&B had agreed that Tyco would accept legal notices concerning potential litigation against T&B.

Cardinal contends the lack of statutory notice should be excused because there was no evidence T&B was prejudiced. However, Cardinal does not cite any authority supporting a rule that the lack of prejudice is a relevant consideration in the notice analysis. In any event, the record does establish prejudice to T&B resulting from the lack of notice. Although T&B may not have been in a position to repair or remedy the problem, one of the important policies underlying the notice requirement is to afford the seller an opportunity to engage in settlement discussions and prepare for litigation. (*Fieldstone, supra*, 54 Cal.App.4th at p. 370; see *Standard Alliance Ind. v. Black Clawson Co., supra*, 587 F.2d at p. 826.) In this case, T&B had no opportunity to preserve any relevant evidence or attempt any form of settlement discussions or negotiations with Cardinal. The first time Cardinal provided any notice to T&B was when Cardinal served its lawsuit on T&B. This did not comply with the statutory requirement.

### III. *Cardinal's Cross-appeal Against T&B*

In its cross-appeal, Cardinal contends the court erred in refusing to instruct the jury on the implied warranty of merchantability claim against T&B. However, because we have concluded that Cardinal's implied warranty claims against T&B were time-barred, Cardinal could not have recovered on

this claim. Thus, we need not reach Cardinal's argument that the facts supported an instruction on this claim.

## IV. *Conclusion on T&B's Appeal*

The judgment must be reversed against T&B on two independent grounds: (1) section 2725, subdivision (2) bars Cardinal's breach of warranty and contract claims because the action was filed more than four years after delivery of the goods; and (2) Cardinal failed to give reasonable statutory notice of the breach as required by section 2607, subdivision (3)(A).

## TYCO'S APPEAL

### I. *Privity*

The jury found Cardinal proved its sole cause of action against Tyco: breach of the implied warranty of fitness for a particular purpose. Tyco contends the cause of action is unsupported because there was no privity between Cardinal and Tyco, and thus the court erred in denying its motions for nonsuit, directed verdict, and judgment notwithstanding the verdict. Although we agree that vertical privity is a necessary element of an implied warranty claim, we conclude the circumstances here come within the "direct dealings" exception to the privity requirement set forth in *U.S. Roofing, Inc. v. Credit Alliance Corp.* (1991) 228 Cal.App.3d 1431 [279 Cal.Rptr. 533] (*U.S. Roofing*). We further conclude the court did not commit prejudicial error in instructing the jury on the privity requirement.

#### A. *Privity Is Generally Required for an Implied Warranty Claim*

"[T]he implied warranty of fitness for a particular purpose is a warranty implied by law when a seller has reason to know that a buyer wishes goods for a particular purpose and is relying on the seller's skill and judgment to furnish those goods." (*Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 189 [6 Cal.Rptr.3d 494].) Vertical privity is a prerequisite in California for recovery on a theory of breach of the implied warranty of fitness, unless an exception applies. (*Burr v. Sherwin Williams Co.* (1954) 42 Cal.2d 682, 695 [268 P.2d 1041]; *Evraets v. Intermedics Intraocular, Inc.* (1994) 29 Cal.App.4th 779, 788 [34 Cal.Rptr.2d 852]; *U.S. Roofing, Inc., supra,* 228 Cal.App.3d at p. 1441.)

Vertical privity means that the buyer and seller were parties to the sales contract. (*Fieldstone, supra,* 54 Cal.App.4th at p. 371.) " '[T]here is no

privity between the original seller and a subsequent purchaser who is in no way a party to the original sale. [Citations.]' " (*Ibid.*) The undisputed evidence established that Cardinal was not in vertical privity with Tyco. Cardinal had no direct contractual relationship with Tyco. Instead, Cardinal had a contractual relationship with Remec for the supply of the MOAB's, and Remec entered into its own contract with Tyco for the supply of the spring probe connectors to be placed on the MOAB's.

At trial, Cardinal essentially acknowledged this lack of a privity relationship, and relied instead on an exception to the privity requirement to avoid a dismissal of the claim. On appeal Cardinal takes a different approach and devotes a substantial portion of its brief to argue that privity existed because Tyco became a party to the 1998 Scheduling Agreement. This argument is not supported by the record. At trial, Cardinal employees testified that Cardinal "cancelled" its agreement with T&B and entered into a new agreement with Remec for the supply of the completed MOAB's. Remec in turn entered into a separate agreement with T&B for the supply of the remaining 900,000 spring probe connectors. Thereafter, T&B sold its electronics division to Tyco. Thus, Tyco could not have been a party to the 1998 Scheduling Agreement because at the time of the sale, T&B was not a party to this agreement.

## B. *"Direct Dealings" Exception to the Privity Requirement*

Despite the lack of vertical privity, the trial court rejected Tyco's arguments that Cardinal's claim failed as a matter of law, concluding that Cardinal's implied warranty cause of action was potentially valid based on a "direct dealings" exception to the privity rule established in *U.S. Roofing, supra*, 228 Cal.App.3d 1431. Tyco contends this case falls outside the exception. In examining this contention, it is helpful to detail the factual circumstances of *U.S. Roofing* and the subsequent decisions that have found *U.S. Roofing* to be distinguishable.

In *U.S. Roofing*, a roofing contractor needed a crane for a roofing job, and began negotiating with a crane supplier for the purchase of a crane. (*U.S. Roofing, supra*, 228 Cal.App.3d at p. 1438.) After the contractor and supplier reached an agreement on the type and price of the crane, the contractor asked the supplier to assist with financing the purchase. In response, the supplier suggested the contractor enter into a lease agreement with a third party as a financing method to obtain tax and other financial savings. Relying on this recommendation, the contractor entered into a lease agreement with a third party lessor. Under the lease agreement, the lessor was required to obtain the particular equipment from the supplier that the parties had already agreed

upon, and then lease this equipment to the contractor. The lessor then purchased the equipment from the supplier and leased the equipment to the contractor.

Shortly after receiving the crane, the contractor experienced problems and cancelled the lease. (*U.S. Roofing, supra*, 228 Cal.App.3d at p. 1439.) The contractor then brought a lawsuit against the supplier, alleging breach of warranty and other claims. (*Ibid.*) At trial, the supplier unsuccessfully argued it could not be held liable on the warranty claim because it did not have a direct privity relationship with the contractor since the contractor and supplier had never entered into a contract. (*Id.* at p. 1441.) The jury ultimately found the supplier liable on a breach of implied warranty theory. (*Id.* at p. 1440.) On appeal, the supplier argued the breach of warranty claim failed as a matter of law because there was no contract (privity) between itself and the contractor. (*Id.* at p. 1442.) Rejecting this argument, the reviewing court reasoned that the supplier "focuses solely on the paper contract" and "ignores the considerable testimony regarding the *direct dealings* between [the supplier and the contractor] for the sale and purchase of the crane. These parties had an oral agreement for the sale of the crane, supported by a deposit of $1,000, followed by a second deposit. [The supplier] admits it made at least one express warranty as to the crane. When [the contractor] experienced problems with the crane, it contacted [the supplier] for relief. Repairs on the crane were arranged and paid for by [the supplier]. From this evidence the jury could find the necessary privity to support liability for breach of an implied warranty." (*Ibid.*, italics added.)

No reported decision has subsequently applied *U.S. Roofing*'s "direct dealings" exception to uphold a warranty claim without a privity relationship. But two California appellate courts have found *U.S. Roofing* to be factually distinguishable, and have refused to expand the scope of the exception. (*Fieldstone, supra*, 54 Cal.App.4th 357; *All West Electronics, Inc. v. M-B-W, Inc.* (1998) 64 Cal.App.4th 717 [75 Cal.Rptr.2d 509] (*All West Electronics*).)

In *Fieldstone*, a residential developer contracted with plumbing subcontractors to install sinks in numerous housing developments, and the subcontractors purchased sinks from the manufacturers. (*Fieldstone, supra*, 54 Cal.App.4th at p. 362.) After the sinks began rusting and chipping, the developer paid to replace 1,900 sinks. (*Ibid.*) The developer then sued the manufacturers on various theories, including breach of implied warranties. The trial court granted summary judgment on this claim based on the lack of vertical privity between the developer and the manufacturers. (*Id.* at p. 363.) In affirming, this court rejected the developer's argument that the developer was in substance the purchaser because some of the manufacturers " 'ma[d]e sales calls' " on the developer, and the " 'plumbers special ordered shipments

of lavatories for use in [the developer's] specifically designated projects . . . .' " (*Id.* at p. 371.) We explained that *U.S. Roofing* was distinguishable because in that case the "parties were in privity for purposes of implied warranty claims where there was considerable evidence they dealt directly with each other vis-à-vis the purchase . . . ." (*Id.* at p. 371, fn. 12.)

The *All West Electronics* court likewise declined to extend *U.S. Roofing* to a situation where the plaintiff and the defendant did not engage in negotiations with respect to the sale of the defective product. (*All West Electronics, supra,* 64 Cal.App.4th at pp. 723–727.) In that case, a slipform paver manufacturer met with a contractor (All West), and demonstrated the operation and performance of the paver. (*Id.* at p. 719.) All West then leased the paver from a retailer, which was one of 1,200 dealers of the manufacturer's paver product. (*Id.* at pp. 719–720.) A manufacturer representative trained All West on the use of the paver. (*Id.* at p. 720.) When All West began to have problems with the paver, it had numerous additional contacts with the manufacturer, which made modifications and repairs to the machine. (*Id.* at p. 721.) After All West continued to experience performance problems with the paver, All West sued the manufacturer, alleging several claims, including breach of the implied warranty. (*Id.* at p. 722.) The court ultimately dismissed All West's warranty claims based on the lack of privity between All West and the manufacturer. (*Id.* at p. 723.) On appeal, All West contended there was "sufficient direct contact" between itself and the manufacturer to support a finding of vertical privity under the *U.S. Roofing* decision. (*Ibid.*) The court rejected this argument, explaining that the parties' "direct dealings" were insufficient to create privity. (*Id.* at p. 725.) The court stated it was "publish[ing] [the decision] to reiterate that the holding of [*U.S. Roofing*] has not eroded the contractual privity requirement . . . ." (*Id.* at p. 718.) Distinguishing *U.S. Roofing*, the court stated that "there was no evidence [the manufacturer] or its agent negotiated the sale of its paver to All West," noting that the manufacturer "did not deal directly with All West regarding the 'purchase' of the paver. The sale/lease was negotiated between All West and [the retailer]." (*Id.* at pp. 726–727.)

## C. *Analysis*

On reviewing the factual record before us, we conclude that for purposes of privity this case resembles *U.S. Roofing* and is unlike *Fieldstone* and *All West*. In reaching this conclusion we look initially at the sales transaction as negotiated between T&B and Cardinal, and then examine the extent to which Tyco adopted this transaction.

First, T&B and Cardinal directly negotiated the sale of the spring probe connectors and set forth their contractual arrangement in the 1998 Scheduling

Agreement. The two parties decided on the price of the product and then agreed upon the precise materials, manufacturing tools, size, design, and the manner in which the connectors would be expected to function. At the time, T&B was aware that Cardinal would select a third party to serve as the middleman to purchase the spring probe connectors from T&B and then assemble these connectors on the manufactured MOAB's, and sell the finished MOAB product to Cardinal. T&B accepted this arrangement, by specifically agreeing to sell the spring probe connectors to the middleman (to be named) at the same price, and essentially agreed that it would sell the spring probe connectors to the third party in the exact same design, materials, and size as the Cardinal/T&B agreement. After Cardinal contracted with Remec and cancelled the scheduling agreement, T&B continued selling the identical product to Remec.

On this record, we would have no problem finding that *T&B* had sufficient vertical privity with Cardinal to support an implied warranty cause of action even after the 1998 Scheduling Agreement was cancelled and Remec took over as the contracting party. Cardinal and T&B negotiated the sale, the equipment to be used, and the price, and then continued a relationship through a third party (Remec) for financial or administrative purposes. There was no functional difference between this relationship and the relationship between the crane supplier and the contractor in *U.S. Roofing*. Remec (like the lessor in *U.S. Roofing*) acted as the "conduit" between the supplier and the purchaser, after the equipment and price had already been negotiated by the parties. Remec and the lessor in *U.S. Roofing* were vehicles to effectuate the sale that had already been agreed upon.

The question before us, however, is not the existence of privity between Cardinal and T&B, but it is whether privity existed between Cardinal and Tyco. The discussion of the post-Remec relationship between Cardinal and T&B is nonetheless critical because it informs the context and foundation for the Cardinal/Tyco relationship. When Tyco purchased T&B, Tyco made clear to Cardinal that nothing had changed and "things would be business as usual." Tyco then specifically adopted the T&B/Cardinal design for the spring probe connectors, and used the manufacturing tools Cardinal paid for as part of the T&B contract to supply the connectors under the same terms of the purchase order that had been binding on T&B. Tyco's argument that "there is no evidence that [Tyco] ever represented to Cardinal that it was utilizing the T&B drawings" is unpersuasive. Although Tyco may not have expressly told Cardinal that it would be adopting T&B's design in manufacturing the product, this was the understanding of all the parties. The undisputed facts show all parties understood Tyco would manufacture the spring probe connectors in the same manner agreed to by T&B. Thereafter, Tyco and Cardinal employees regularly discussed purchasing and production issues,

including delivery schedule information. Tyco and Cardinal then jointly acted to investigate the cause of the spring probe connector problems.

Thus, although it did not itself engage in negotiations with Cardinal pertaining to the *initial* purchase agreement for the spring probe connectors, Tyco accepted and benefited from those negotiations in taking T&B's place as the product supplier. Tyco was fully aware that Cardinal was the exclusive purchaser of the spring probe connectors, and that the product was manufactured to meet precise specifications. It was also aware that Cardinal had expected and intended that Tyco would abide by the purchase agreement that had been negotiated between T&B and Cardinal. Tyco evidenced its acceptance of these sales terms by manufacturing and supplying the custom spring probe connectors for Cardinal according to the same terms, specifications, design requirements and manufacturing techniques agreed to by T&B and Cardinal.

These facts distinguish this case from *Fieldstone* and *All West Electronics*. In both of those cases, the parties' dealings occurred primarily after the purchase, and there were no facts showing that the seller had essentially taken the place of the party that had negotiated the initial deal. (*All West Electronics, supra*, 64 Cal.App.4th at pp. 719–722; *Fieldstone, supra*, 54 Cal.App.4th at p. 371.) In this case, Tyco *continued* to supply the custom product to a single customer, knowing that the customer was relying on it to provide a product that was specially fit for the customer's needs. Although direct dealings between a purchaser and manufacturer after the purchase are generally insufficient to create an exception to the privity requirement, where as here the manufacturer essentially adopts and benefits from the initial sales negotiations and there are numerous direct dealings between the parties, the requisite privity can be established.

Further, unlike the retailer in *All West* or the plumbing subcontractors in *Fieldstone*, Remec had no control over whether to sell the product to the purchaser. Pursuant to its contract with Cardinal, Remec was required to purchase the spring probe connectors from Tyco at the price agreed upon by the parties, and it had no discretion as to the amount of connectors to be purchased, the delivery dates, or the design or specifications of the spring probe connectors. Remec essentially carried out the ministerial duties of issuing batch purchase orders to Tyco and paying for the connectors (for which Cardinal reimbursed Remec) at the price Cardinal had negotiated in the initial scheduling agreement.

Privity is generally not required for liability on an *express* warranty because it is deemed fair to impose responsibility on one who makes affirmative claims as to the merits of the product, upon which the remote

consumer presumably relies. (*Hayman v. Shoemake* (1962) 203 Cal.App.2d 140, 157 [21 Cal.Rptr. 519].) However, where the subject of the action is an implied warranty—i.e., one that is implied in law and *did not originate from the manufacturer's own statements or conduct*—there is no similar justification for imposing liability on a defendant in favor of every remote purchaser. (*Ibid.*) Absent an affirmative warranty by the manufacturer, the potential liability based on an obligation imposed by law would be so far reaching that it could not be justified. However, where, as here, the manufacturer or supplier affirmatively engages in conduct directly with the purchaser that functionally places the party in the position of the direct *seller*, it is fair and appropriate to imply a warranty that the goods will be fit for the buyer's purposes, if all other elements of the claim have been established. Under the circumstances here, Tyco's actions brought itself into "privity" with Cardinal for purposes of the breach of an implied warranty claim.

Tyco argues that "[a]llowing post-contractual dealings to substitute for contractual privity deprives a seller like [Tyco] of the ability to disclaim implied warranties." Tyco maintains that if it had reasonably expected it would be held liable to Cardinal on a warranty theory, it would "have insisted on the same terms and conditions with the same disclaimers and limitations on liability as it had with the true contracting party, Remec." Although these arguments may have persuasive value under different factual circumstances, they are unavailing in this case. Tyco does not cite to any evidence as to any such disclaimers or limitations on liability in its contract with Remec, or that such limitations would have been accepted. Moreover, given its close and continuing relationship with Cardinal, which was the sole purchaser of the spring probe connectors, Tyco could have protected itself by taking some affirmative action, such as notifying Cardinal that it was not providing any form of warranty that the spring probe connectors would be fit for use in the MedStation.

 Tyco next argues Cardinal could not have relied on Tyco's skill and judgment because Tyco was not involved with Cardinal in any of the negotiations for the sale of the spring probe connectors and Cardinal had jointly designed the spring probe connectors with T&B before Tyco purchased T&B's electronics division. To establish breach of an implied warranty of fitness for a particular purpose under section 2315, the buyer must establish he or she relied on the seller's skill or judgment to "select *or* furnish" suitable goods. (§ 2315, italics added; see *Metowski v. Traid Corp.* (1972) 28 Cal.App.3d 332, 341 [104 Cal.Rptr. 599].)

Substantial evidence established that Cardinal relied on Tyco's skill and judgment in furnishing suitable connectors. Tyco, a highly regarded manufacturer of electronics products, continued to supply connectors for Cardinal,

knowing that Cardinal was its sole customer and knowing the purposes of the connectors. Cardinal presented evidence showing that it did not have expertise in designing or manufacturing the connectors. Cardinal initially relied on T&B's skill and judgment to design and select the connectors suitable for the MOAB's in the MedStations. After Tyco purchased T&B's electronics division and took over manufacturing the connectors according to T&B's drawings, Cardinal then relied on the skill and judgment of Tyco to furnish connectors suitable for the MedStations. Cardinal did not stop relying on the manufacturer to furnish suitable connectors just because Tyco took over the production through its acquisition of T&B's connector division.

### D. *Alleged Instructional Error*

Tyco additionally contends the court erred in instructing the jury on the privity requirement. The court told the jury that to establish the implied warranty of fitness claim against Tyco, Cardinal must prove: "Cardinal . . . had such direct dealings with Tyco . . . that their relationship was as if Tyco . . . was selling the spring probe connectors directly to Cardinal." This instruction was not as precise as it could have been. We agree with Tyco that it is possible the jury could have interpreted this instruction as if postsale communications between Cardinal and Tyco were enough to satisfy the privity requirement in this case. However, any instructional error was not prejudicial.

As discussed, the relevant facts supporting an exception to the privity requirement in this case were largely undisputed. The evidence showed the existence of direct negotiations between Cardinal and T&B for the design, specifications, and purchase of the spring probe connectors, that the Remec contract replacing the 1998 Scheduling Agreement was for the administrative convenience of the parties and did not alter the imposition of the warranties by T&B, and Tyco fully understood and accepted the obligation to continue providing the product under these same specifications. Although these undisputed facts do not show a direct *contractual* relationship between Cardinal and Tyco, they fully supported the basis for an implied warranty cause of action without a specific contractual relationship.

### II. *Causation*

To recover on a breach of warranty cause of action, the plaintiff must show the breach caused the plaintiff to " 'suffer injury, damage, loss or harm.' " (*Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 415–416 [9 Cal.Rptr.3d 242].) In the special verdict, the jury specifically found Tyco's breach of the implied warranty of fitness for a particular

purpose was a "substantial factor in causing harm" to Cardinal. Tyco challenges the sufficiency of the evidence to support this factual conclusion.

In examining this argument, we apply the substantial evidence review standard. "[W]e indulge in every reasonable inference to uphold the verdict if possible and defer to the jury's assessment of the credibility of the witnesses. [Citation.]" (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 889 [93 Cal.Rptr.2d 364]; see *Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831, 836–837 [41 Cal.Rptr.2d 561].) "We view the evidence most favorably to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." (*Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th. 1094, 1100 [109 Cal.Rptr.2d 583].)

Cardinal presented evidence showing that Tyco supplied spring probe connectors that had inadequate gold plating on the interior portion of the barrels. The evidence also showed that if the spring probe connectors were not properly plated, there would be oxidation and corrosion in the connectors, which can create an obstacle preventing the spring path from reliably transmitting electrical current. The evidence further showed the spring path was the primary path for transmitting the electricity within the spring probe connectors. If the spring probe connectors do not transmit current, that means there is no electricity going through the connector and therefore there is no connection between the Cubie pocket and the MOAB. Without a connection, the Cubie pocket will not open, and the MedStation system will fail to operate as expected. Although there was evidence of other possible causes of the Cubie pocket failures, the jury had a reasonable basis to conclude that the defect in the spring probe connectors was a substantial factor in causing these failures.

The evidence also showed that if one Cubie pocket failed to open, the medical personnel would be unable to promptly access that patient's medication, rendering the machine unsuitable for use by the hospital. When the product failed in this way, Cardinal would suffer monetary harm because it would be required to repair the machine by replacing the defective spring probe connectors.

Based on this evidence, the jury could reasonably conclude Cardinal was harmed *as a result of* Tyco's breach of the implied warranty for fitness. To establish causation on a warranty claim, the evidence need only afford a reasonable basis for the conclusion that it is more likely than not that the defect caused the harm. Causation is generally a question of fact for the jury.

(*Lombardo v. Huysentruyt* (2001) 91 Cal.App.4th 656, 666 [110 Cal.Rptr.2d 691].)

Tyco contends insufficient evidence supported the causation element because defendants did not produce a witness who testified that he or she examined a spring probe connector from a MedStation machine that had been returned by a hospital for a Cubie failure problem and that *this* spring probe connector was defective.

This argument is factually and legally unsupported. First, there was at least some evidence showing that a "failed" MedStation machine contained a defective (inadequately plated) spring probe connector. Cardinal's expert, Yale Barkan, examined the spring probe connectors from a "returned" MedStation, and found that the pins on the spring probe connectors were inadequately plated. Although Barkan did not specifically know whether the "returned" MedStation had "failed," the jury could reasonably infer this to be the case since there was evidence showing that the MedStations had been "returned" because of Cubie pocket failures. Additionally, Reidel of PhotoMetrics examined several pins from a "failed" MedStation machine, and determined that the pins lacked gold plating and exhibited corrosion. Although (as discussed below) this evidence was not sufficient to show how many of the spring probe connectors were defective, it did establish a basis for concluding that the improper plating defect was a cause of the MedStation failures.

Further, even if Cardinal had not produced direct evidence of a defective spring probe connector contained on a failed MOAB, the jury could infer based on the evidence presented that the numerous Cubie pocket failures were caused by the defect. Causation need not be proved with absolute certainty, and can be shown by circumstantial evidence. (See *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1242–1243 [135 Cal.Rptr.2d 629, 70 P.3d 1046].)

Cardinal produced evidence showing that numerous spring probe connectors had inadequate gold plating and presented expert testimony that spring probe connectors with inadequate plating would frequently fail to transmit electrical current and thus cause the Cubie pocket doors to fail to open. Further, Cardinal proved that many MOAB's "failed" when used by hospitals, meaning that a Cubie pocket would not open when it was directed to do so by the computer software. Although Cardinal did not call any of its customers (hospital employees) to testify about the failures, two Cardinal employees testified that they personally witnessed the failures when visiting customer hospitals. The evidence also showed that tests conducted by Remec

and Cardinal manifested numerous failures with the Cubie pocket openings. Cardinal also showed that when the spring probe connectors were replaced with connectors manufactured by another company, Remec's testing revealed no electrical connection problems with these new connectors. Viewing the totality of the evidence, the record was sufficient to show that the gold plating defect in the spring probe connectors was a cause of the Cubie failures.

### III. *"Substantially Certain" to Fail*

Tyco next contends the judgment must be reversed because there was no evidence showing the MedStations were "substantially certain to fail," and the jury was not asked to make this finding in the special verdict form.[4] In support of these arguments, Tyco relies primarily on *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908 [107 Cal.Rptr.2d 761] (*Hicks*). We agree that *Hicks* articulated the correct test under California law, but this test does not undermine the jury's conclusions on the liability portion of the judgment.

In *Hicks*, two homeowners brought a class action complaint against a developer and general contractor, alleging these defendants used an " 'inherently defective' " material in constructing the concrete slab foundations under plaintiffs' homes, and the use of this defective product breached express and implied warranties. (*Hicks, supra,* 89 Cal.App.4th at pp. 912–913.) The plaintiffs sought to represent a class of persons who owned homes constructed with the alleged defective material. The trial court denied class certification on the ground that " 'common factual issues do not predominate,' " because it would be necessary for each homeowner to prove that the defect manifested damage to his or her home. (*Id.* at p. 916.)

The *Hicks* court disagreed with this ruling on the warranty claims, concluding that actual manifestation of damages is not necessarily an element of the breach of warranty claims. (*Hicks, supra,* 89 Cal.App.4th at pp. 916–923.) The court explained that: "The question before us is whether malfunction is an element of a cause of action for breach of warranty. . . . [W]e conclude proof of breach of warranty does not require proof the product has malfunctioned but only that it contains an inherent defect which is *substantially certain* to result in malfunction during the useful life of the product." (*Id.* at pp. 917–918, italics added; accord, *Hewlett-Packard Co. v. Superior Court* (2008) 167 Cal.App.4th 87, 96 [83 Cal.Rptr.3d 836].) Based

---

[4] The "substantially certain" argument was originally made by T&B, but Tyco expressly joined in the argument. We thus treat the argument as if it were made by Tyco.

on this conclusion, the *Hicks* court held that common questions of law and fact predominate on the warranty causes of action because "if plaintiffs prove . . . an inherent defect which is substantially certain to result in malfunction during the useful life of the product they have established a breach of . . . express and implied warranties. . . ." (*Hicks, supra,* at p. 923.)

Tyco argues these principles apply here to require reversal of the judgment because there was no statistical or other evidence showing it is "substantially certain" the defect in the spring probe connectors will manifest damages during the useful life of the product. This argument is without merit because Cardinal presented evidence of an actual malfunction caused by the defective spring probe connectors, and therefore necessarily satisfied the "substantially certain" test. As explained above, the evidence showed that the inadequate plating on the spring probe connectors prevented the connectors from reliably transmitting electricity and therefore caused intermittent electrical opens which caused the Cubie pockets not to open in response to a computer command. The lack of this electrical connection means that the MedStation did not perform in the manner expected and thus required Cardinal to replace the spring probe connectors with functioning connectors. Thus, unlike *Hicks*, this is not an "unmanifested defect" case where the issue concerns a defect that has not yet caused any damages.

In reaching this conclusion, we recognize that not all of the spring probe connectors were defective and not all of the MedStations manifested problems with the Cubie pockets. This evidence, however, does not defeat the jury's conclusion that Tyco breached the warranty of fitness for a particular purpose. Even if only one product manifested the damages, Cardinal would prove its breach of warranty case and be entitled to recover for this (albeit minimal) economic loss. The issue that the damage did not manifest in all the products raises the issue of the proper amount of damages to which Cardinal is entitled, not the question of whether Tyco is liable for a breach of warranty at all.

## IV. *Amount of Damages*

Tyco next challenges the sufficiency of the evidence to support the damages award.

Section 2714 sets forth the basic measure of damages for a breach of warranty where, as here, the buyer has accepted the goods and given proper notice of the breach. Under section 2714, the buyer "may recover, as damages . . . the loss resulting . . . from the seller's breach as determined in

any manner that is reasonable. [¶] . . . The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount."

In this case, Cardinal presented evidence that Tyco's spring probe connectors were defective and Cardinal sought to recover the costs to replace the connectors with nondefective connectors. Cardinal presented evidence of its costs to replace all spring probe connectors on all MedStations that had been returned because of a 1 percent failure rate, and its projected future replacement costs on all remaining MedStations. As against Tyco, the jury awarded Tyco's share (93.7 percent) of *all* of these past and future replacement costs.

In challenging this damages award, Tyco does not dispute that replacement costs are a proper reflection of the loss in value of a defective product, and thus are a proper damage measure for breach of warranty under section 2714. (See 1 White & Summers, Uniform Commercial Code, *supra*, § 10-2, pp. 554–559.) Tyco instead contends the damages award was excessive because the evidence was undisputed that not all spring probe connectors were defective, and there was no statistical or other evidence to show how many of the spring probe connectors were defective. Specifically, Tyco argues the damages award was unsupported because there was no statistical evidence to show that tests performed on a small number of spring probe connectors could be extrapolated to apply to the "entire universe of connectors" supplied to Cardinal by defendants. We reject this argument as to the damages for the past replacement costs, but agree that the future cost award was unsupported by the evidence.

## A. Past Damages

With respect to the past damages awarded, these damages reflected the cost of replacing the spring probe connectors in all machines that had a 1 percent failure rate. Cardinal produced evidence that approximately 57 percent of its MedStation machines operating in hospitals had at least a 1 percent failure rate, meaning that the Cubie pockets would fail to open at least one out of every 100 attempts. This rate was deemed unacceptable by Cardinal because of the particular use of the MedStation—supplying prescription medicine to patients in hospitals where the very purpose of the machine was to create a more efficient and accurate system for medicine delivery. Because Cardinal could not determine whether a particular spring probe connector was defective unless the connector was cut open and destroyed, it was reasonable for

Cardinal to repair and replace all of the spring probe connectors on the particular MOAB board that contained a failed Cubie pocket. Piecemeal replacement of only the connectors that had failed on a single MOAB board was unreasonable and was not required.

## B. *Future Damages*

With respect to the MedStations remaining in the field, Cardinal presented *no* evidence that any of these machines had failed, nor did Cardinal present any statistical evidence showing the percentage of machines that would be expected to fail based on the number of spring probe connectors that had been tested or MOAB's that had been returned. Further, Cardinal's witnesses acknowledged that not every spring probe connector was defective (had improper gold plating), and that even with improper gold plating, it was possible for a spring probe connector to function properly.

Given this evidentiary record, Cardinal's counsel made clear to the court that Cardinal was not taking the position that the defect in the spring probe connectors would cause a failure in every MedStation, and stated, "I don't think they will all have to be replaced. I don't think we intend to put on that case." Counsel later repeated that "some of them [the spring probe connectors] are plated okay, some of them will not fail."

Consistent with these statements, during closing argument, Cardinal's counsel asserted that Cardinal had made a "restrained and measured" decision to replace only those MOAB's that had at least a 1 percent failure rate. Counsel told the jury that this approach would "sav[e] defendants money" because "[i]t would cost more to replace all of them," and acknowledged that "they won't all fail and you can't tell whether they're going to fail . . . ." In then discussing "future damages," counsel told the jury that it should make a "reasonable approximation" of the future damages based on Cardinal's accounting expert's testimony of the total cost of replacing every spring probe connector on every MedStation. But counsel emphasized that he did not think the amount of MedStations that would eventually fail is "anywhere near the total number that are out there" and that counsel did not think the damages are "anywhere near the top-end number" given by Cardinal's accounting expert.

Despite counsel's concessions, the jury found Tyco was responsible for an amount of damages that reflected the costs of repairing every MedStation containing Tyco spring probe connectors that had been sold to Cardinal.

On the record before us, there was no principled basis upon which the jury could have awarded Cardinal the cost of replacing every single Tyco spring

probe connector on MOAB's that had not yet manifested any failure. Cardinal did not present any evidence as to the percentage of spring probe connectors that were likely to fail during the useful life of the product. Cardinal also admitted that not every spring probe connector was defective and not every MedStation would fail to operate as expected.

 Unless a product actually manifests an alleged defect, the plaintiff has not suffered damages with respect to an implied warranty claim. (See *Jarman v. United Industries Corp.* (S.D.Miss. 2000) 98 F.Supp.2d 757, 768 [a warranty claim requires that "there is actually a failure in product performance . . . ," and "[m]ere suspicion of a lost bargain . . . will not support an award of damages"].) If a manufacturer supplies a product that will not manifest any defect during the product's useful life or cause any harm or injury, the purchaser has obtained the full benefit of his or her bargain, and there is no basis to provide compensation to the purchaser. (See *Hicks, supra,* 89 Cal.App.4th at p. 923 ["[i]f the defect has not manifested itself [during the product's useful life], the buyer has received what he bargained for"].)

To justify the future damages award, Cardinal argues that: "the jury properly concluded that the nonconforming connectors remaining on MOAB's in the field would almost all eventually have to be replaced." But Cardinal does not cite to any evidence to support this conclusion, and we have found none. In this regard, *Altronics of Bethlehem, Inc. v. Repco, Inc.* (3d Cir. 1992) 957 F.2d 1102 (*Altronics*), relied upon by Cardinal, is factually distinguishable.

In *Altronics*, the defendant sold three electronic security equipment systems to the plaintiffs, which delivered and installed security systems to consumers. (*Altronics, supra,* 957 F.2d at pp. 1103–1104.) After the plaintiffs installed the first system, the system functioned properly. However, the second system was installed in a different location and did not function. (*Id.* at p. 1104.) Based on the problems with the second system, the plaintiffs made a decision not to install the third system. (*Ibid.*) The plaintiffs then brought a breach of implied warranties claim seeking to recover the purchase price of the second and third systems. (*Ibid.*) The trial court found the defendant breached implied warranties and entered judgment in the plaintiffs' favor. On appeal, the defendant argued that even if the second system was defective, the court erroneously included the costs of the third system in the damages award because there was no evidence that the third system, still in its original packing boxes, was defective. (*Id.* at p. 1106.) The reviewing court rejected this argument, upholding the trial court's conclusion that it was not "unreasonable" for the plaintiffs to choose not to install the third system "given the failure of the [second] system." (*Ibid.*) The *Altronics* court noted that the plaintiffs presented evidence that the location of the first system—involving short distances and flat terrain between subscriber antennas and the main antenna

location—was very different from the location where the second system was installed and where the third system was to be installed. (*Id.* at pp. 1106–1107.) Additionally, the plaintiffs presented evidence that an inspection of the boxes containing the third system revealed various problems with the inventory. (*Id.* at p. 1107.) The court also noted that "plaintiffs' decision not to install the third system comported with the general duty to mitigate damages arising from a breach of contract." (*Ibid.*)

This case is different. There was no evidence here that because there were problems with some spring probe connectors that all spring probe connectors were defective. In fact, at trial Cardinal admitted to the jury and to the trial court that not all of the spring probe connectors were defective and not all MedStations would experience problems resulting from the defect. *Altronics* concerned the issue as to whether a single product that had not yet manifested a problem was defective based on the similarity between that system and another defective system and obvious defects in the packing materials. In this case, we are concerned with thousands of spring probe connectors, and plaintiffs did not present any statistical or other evidence showing the connection between the failed MedStation machines and those that were still functioning. Additionally, in *Altronics*, if the plaintiffs had installed the system and it had not functioned properly, there would be additional consequential damages, including substantial service costs; thus the plaintiffs mitigated these damages by not installing the system. There was no evidence here of comparable mitigation costs relating to the MedStations that did not manifest any defect.

Because the evidence was insufficient to support the future damages award, we strike that portion of the award, without granting a retrial on the issue. If the plaintiff had a "full and fair opportunity" to present the supporting evidence, and the evidence was insufficient as a matter of law to support a damages award, a reviewing court may strike the award without ordering a retrial. (See *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 919 [52 Cal.Rptr.3d 126] [reversing punitive damages award].) In this case, Cardinal had a full and fair opportunity at the six-week trial to present evidence supporting its damage claims, including its claim for future damages. During trial, defendants brought several potentially dispositive motions challenging the sufficiency of the evidence to support Cardinal's claimed losses, putting Cardinal on heightened notice of the need to produce sufficient evidence on its damage claims. Defendants also moved for a new trial and a judgment notwithstanding the verdict on the basis that the evidence was insufficient to support the damages award. (See *McCoy v. Hearst Corp.* (1991) 227 Cal.App.3d 1657, 1661 [278 Cal.Rptr. 596]; *Bank of America v. Superior Court* (1990) 220 Cal.App.3d 613, 626–627 [269 Cal.Rptr. 596].) Further, Cardinal has never suggested the existence of any new evidence that could be presented on retrial.

Under the circumstances, it would serve no purpose to permit a retrial on future damages. " '[F]or our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings.' " (*Kelly v. Haag, supra,* 145 Cal.App.4th at p. 919, quoting *Silberg v. Anderson* (1990) 50 Cal.3d 205, 214 [266 Cal.Rptr. 638, 786 P.2d 365].)

## V. *Cardinal's Cross-appeal Against Tyco*

In its cross-appeal against Tyco, Cardinal contends the court erred in granting a nonsuit on Cardinal's express warranty claim against Tyco, and in dismissing Cardinal's implied warranty of merchantability claim. Because Cardinal has admitted, and the evidence supports, that Cardinal's claimed damages on each of its implied and express warranty claims are identical, we need not reach the merits of Cardinal's arguments on the cross-appeal. Even if the court erred in dismissing the express warranty and implied warranty of merchantability claims, the result would be the same.

## CARDINAL'S APPEAL AGAINST REMEC

Cardinal contends the court erred in awarding Remec costs as a prevailing party because Remec's motion for costs was untimely under California Rules of Court, rule 3.1700 (Rule 3.1700).[5]

Rule 3.1700(a) states: "A prevailing party who claims costs must serve and file a memorandum of costs within 15 days after the date of mailing of the notice of entry of judgment or dismissal by the clerk under Code of Civil Procedure section 664.5 or the date of service of written notice of entry of judgment or dismissal, or within 180 days after entry of judgment, whichever is first." Rule 3.1700(b)(3) provides that parties may agree to extend these deadlines, or "[i]n the absence of an agreement, the court may extend the times for serving and filing the cost memorandum . . . for a period not to exceed 30 days."

During trial, the court granted Remec a nonsuit on all of Cardinal's claims. On August 1, 2006, Remec served a file-stamped copy of the trial court's order granting the nonsuit. The court entered judgment on Cardinal's claims against Tyco and T&B on August 8, 2006, notice of which was served on August 14, 2006. Remec filed its costs memorandum on August 29, 2006. On September 18, 2006, Cardinal moved to tax Remec's costs. Following argument, the court entered an order awarding Remec $79,632.44 in costs.

---

[5] We grant Remec's unopposed motion to augment the record with related motions filed in the proceedings below. All further rule references are to the California Rules of Court.

Cardinal contends Remec was required to file its cost memorandum within 15 days after the service of the nonsuit order, and therefore the August 29 cost memorandum was untimely. We reject this argument.

First, Cardinal waived its argument as to the timeliness of Remec's cost memorandum because Cardinal never raised the issue in the trial court. Issues cannot be raised for the first time on appeal. (*Yeung v. Soos* (2004) 119 Cal.App.4th 576, 583 [14 Cal.Rptr.3d 502].) *Hydratec, Inc. v. Sun Valley 260 Orchard & Vineyard Co.* (1990) 223 Cal.App.3d 924 [272 Cal.Rptr. 899], relied upon by Cardinal, supports our conclusion. In *Hydratec*, the court held that a party's complete failure to request an award of costs waives the party's right to a cost award. (*Id.* at pp. 928–929.) Similarly, Cardinal's complete failure to challenge the timeliness of the motion in the trial court waives Cardinal's argument on appeal.

But even if we were to reach the merits, we would conclude there was no error. We necessarily infer from the court's ruling that it granted Remec a 30-day extension to file the cost memorandum under Rule 3.1700(b)(3). Under this rule, a trial court may grant the extension on its own motion. (See *Adam v. DeCharon* (1995) 31 Cal.App.4th 708, 713 [37 Cal.Rptr.2d 195].) The rule does not require that the party expressly request the extension, or that the court specifically state that it granted the extension. A trial court is presumed to know and understand the applicable law. (See *People v. Coddington* (2000) 23 Cal.4th 529, 644 [97 Cal.Rptr.2d 528, 2 P.3d 1081].)

Further, the court did not abuse its discretion in granting the extension. Remec's memorandum of costs was filed two weeks after the statutory deadline. Cardinal then filed a motion to tax and a reply brief, and had the full opportunity to challenge the cost motion at the hearing on the motion. Cardinal never raised the issue of timeliness, nor did it suggest any basis for the court to conclude that Cardinal would be prejudiced if the court extended the date of the filing. On this record, there was no abuse of discretion.

## DISPOSITION

The judgment is reversed as to T&B. The judgment is affirmed as to Tyco, except that we strike the award for future damages ($5,543,784.87). The cost award in favor of Remec is affirmed.

T&B is awarded costs against Cardinal. Cardinal and Tyco are to bear their own costs. Remec is awarded costs against Cardinal.

McDonald, J., and O'Rourke, J., concurred.

The petition of appellant Cardinal Health 301, Inc., for review by the Supreme Court was denied April 1, 2009, S170035. Corrigan, J., did not participate therein.