Filed 8/24/16  T.C. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| T.C.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>    Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU et al.,<br><br>    Real Parties in Interest. | A148248<br><br>(Contra Costa County<br>Super. Ct. No. J15-00801) |

By this petition for an extraordinary writ (Cal. Rules of Court, rule 8.452), petitioner T.C., the mother of minor I.J., seeks to vacate the order of respondent Superior Court of Contra Costa County bypassing reunification services under Welfare and Institutions Code section 361.5, subdivision (b)(10),[1] and setting a section 366.26 hearing to terminate her parental rights to I.J.  T.C. contends that the denial of services pursuant to section 361.5, subdivision (b)(10), was error because she made reasonable efforts to treat the problems that led to the removal of I.J.'s half-siblings.  We agree, concluding the juvenile court's order is

_____

[1] All statutory references are to the Welfare and Institutions Code.

1

unsupported by substantial evidence, and thus grant T.C.'s petition and direct the court to order six months of reunification services.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Family

T.C. is the mother of three girls. This dependency proceeding involves her daughter, I.J., who was born in mid-July 2015. The alleged father of I.J. is G.J.[2] I.J. was taken into protective custody when she was two days old.

T.C. also has two older daughters (six years, two months and one year, three months at the time this proceeding was initiated), fathered by two different men. Those two children were removed from T.C.'s care in July 2014 and were the subjects of dependency proceedings that were ongoing when this case began. T.C.'s reunification services as to her older daughters were terminated in September 2015, two months after this case was filed.

T.C.'s relationships with all three men have been fraught with domestic violence.

### The Petition

On July 21, 2015, the Contra Costa County Children and Family Services Bureau (Bureau) filed a section 300 dependency petition alleging that T.C. failed to protect I.J. within the meaning of section 300, subdivision (b), because she had "a serious problem with ongoing domestic violence in her interpersonal relationship." It identified three instances in December 2014 and March and April 2015 when G.J. physically abused her. The petition further alleged that T.C. "continue[d] to exhibit poor impulsivity and lack of judgment," citing two incidents that month, one when she threatened the social worker in the proceedings involving her two older children and one when she had an outburst

---

[2] T.C. and G.J. were never married. G.J. failed to complete paternity testing and was never elevated to presumed father status in this case. This writ petition was filed only on behalf of T.C. Accordingly, facts regarding G.J. are omitted, except where relevant to the issues before us.

upon being told I.J. was going to be detained. Both problems, according to the petition, placed I.J. at serious risk of harm.

**Detention/Jurisdiction Report**

In a combined detention/jurisdiction report, the Bureau explained that the dependency proceedings involving T.C.'s two older children followed an incident in July 2014 in which T.C. took a picture of her infant daughter (then just a few months old) and sent it to the father, telling him she had abandoned the child. T.C. told the social worker in this case that the father (to whom she was still legally married) had threatened to kill her, and she sent the picture so he would think their daughter was no longer in her care. She recognized it was a " 'stupid mistake' " and regretted doing it. She wanted to have her older children returned to her care and was working hard to complete her reunification plan. She had completed a parenting class, attended domestic violence treatment, completed a mental health evaluation, and was seeing a therapist (Lisa Slater). According to the Bureau's report, the allegations in those proceedings were general neglect and caretaker absence/incapacity.

The report also detailed the allegations concerning T.C.'s impulsivity and lack of judgment. One incident involved threats T.C. made regarding the social worker handling the ongoing cases. She admitted telling her therapist that she would kick the social worker's " 'ass' " and " 'over [her] dead body [would she let the social worker] take [her] baby from [her].' " As T.C. explained it, she was very upset that the social worker had recommended termination of her reunification services. She claimed the social worker would not listen to her concerns about the children being in the care of the paternal grandmother. She also believed the social worker was retaliating because T.C. had reported her to the ombudsman's office.

The second incident occurred in the hospital when I.J. was taken into protective custody. After the social worker explained to T.C. the reasons for the detention and left the hospital room, T.C. "began to scream and threw over her bed

3

tray.  The police were called back into her room and assessed her for a 5150 hold. The mother said 'why would I want to hurt myself . . . I want my children back.' The mother was then escorted by security out of the hospital and put into a taxi."

T.C. admitted that there had been domestic violence in her relationship with G.J.  The report outlined four altercations between T.C. and G.J. that had resulted in police contact:

On December 5, 2014, T.C. called the police when G.J. kicked and punched the bedroom door because he wanted to talk to her and then held her arms when she attempted to leave the house.

On March 16, 2015, T.C., then 18 weeks pregnant, called the police after G.J. punched her in the face.  She obtained an emergency protective order following that incident but did not follow through with obtaining a permanent protective order.

On April 3, 2015, T.C. called the police from her bedroom after G.J. verbally and physically assaulted her.

On April 16, 2015, the police responded to multiple hang-up calls from T.C.'s residence.  T.C., then 22 weeks pregnant, reported that she had told G.J., who was very drunk, to pack his belongings and leave her house.  He started yelling at her and calling her names and then slapped or pushed on her stomach with an open hand.

T.C. filed for a second domestic violence restraining order on June 25, 2015, but she missed the hearing on a permanent restraining order because it was scheduled for the day she gave birth to I.J.  T.C. admitted she contacted G.J.'s family when she went into labor because she wanted him to be present for the birth of their child.  According to T.C., G.J.'s family contacted him, and he went to her house.

On July 21, T.C. thanked the social worker for having taken I.J. into protective custody because there had been another altercation the previous night, and I.J. could have been at risk if she had been in the home.  T.C. explained that

4

G.J. somehow came into possession of a key to her apartment and entered it uninvited. He was drunk, and when she asked him to leave, he refused, threw juice at her, and then kicked and broke her television. She fled the apartment and called the police. T.C. said she would be going to the courthouse that day to finalize the restraining order. She wanted to relocate because she did not feel safe. She had contacted her therapist, Lisa Slater, and scheduled an appointment.

The social worker spoke with Ms. Slater, who reported that she began to see a decline in T.C.'s mental health after the social worker in the continuing dependency proceedings recommended termination of reunification services. T.C. made threats about that social worker to Ms. Slater, who told T.C. she would need to report the threats. T.C. then fired Ms. Slater, saying she was done with therapy and did not plan to attend any more sessions. Ms. Slater expressed concern that T.C. was prone to postpartum depression and was not getting the mental health support she needed at that time. She was also concerned that T.C. engaged in relationships with abusive men and was minimizing the violence inflicted by G.J.

The Bureau reported that T.C.'s oldest daughter had been the subject of a prior dependency in Washington state. According to a June 10, 2010 doctor's report, T.C. had abandoned the six-month-old child on a sidewalk. The doctor had diagnosed T.C. with anxiety, depression, and PTSD, and had determined she was unable to parent her daughter at that time. Allegations of neglect were substantiated, and T.C. reunified with her daughter after 11 months.

The Bureau also summarized a psychological report prepared in the ongoing dependency proceedings. The psychologist diagnosed T.C. with a major depressive disorder, noting that while she did not meet the criteria for PTSD, her traumatic history was likely still affecting her functioning. The psychologist made the following recommendation: " '[T.C.] has made progress and shown commitment to engaging in the required work to reunify with her daughters by completing this evaluation. While her progress has been slow to this point, it appears that she has the potential to successfully and safely parent her daughters.

In light of her history, her current level of external support, and the impending birth of her third daughter, [T.C.] may not be presently able to manage the stress and challenges of parenting three small children without additional assistance. If re-unification planning is to continue, it should occur cautiously through gradual increases in visitation and responsibility. To ensure the safety of her daughters and successful re-unification, [T.C.] must continue to work individually with a therapist to address her internal emotional functioning while external supports are implemented for her.' ''

On July 9, 2015—after T.C. terminated her therapy with Ms. Slater and six days before I.J.'s birth—the psychologist prepared an update in which he reported that " 'given [T.C.'s] termination of individual therapy, there is no way to guarantee she will achieve the psychological stability necessary to safely parent her children. In light of the current instability and the possible negative outcomes of her approaching dependency hearing, there is concern that she is at risk of acting out against others or herself. As she is no longer in therapy there is no way to monitor these domains.' ''

**Detention and Jurisdiction**

On July 22, 2015, I.J. was ordered detained, and the matter was continued for a jurisdiction hearing. On October 8, the court took jurisdiction over I.J. after T.C. pleaded no contest to the following allegations: "On or about July 16, 2015, the mother admitted having been in domestic violence altercations with [G.J.] which places the child in serious risk of harm," and "The mother continues to exhibit poor impulsivity and lack of judgment which places the child at serious risk of harm."

The matter was set for a disposition hearing on November 13, 2015. Through no fault of T.C.'s, disposition was continued multiple times, finally coming on for a contested hearing on April 19, 2016.

6

**Disposition Report**

On November 10, in anticipation of a November 13 disposition hearing, the Bureau prepared a report in which it recommended that reunification services for T.C. be bypassed under section 361.5, subdivision (b)(10). The Bureau had "several concerns . . . , one of which is [T.C.'s] history of domestic violence with each of the fathers of her children. Incidents between [T.C.] and [G.J.] are as recent as July 17, 2015, the day [I.J.] was detained. Another concern is [T.C.'s] lack of impulse control and her anger management issues, which seems to be a consistent and prevalent pattern throughout her life. Both of these issues are reflected in an incident that took place on July 28, 2015—when [T.C.] contacted [the paternal grandmother and great grandmother of her middle child] by phone several times, despite no contact orders for both women. Subsequently, both women filed police reports. A final concern is around her mental health issues, particularly PTSD, and the inconsistent treatment thereof." T.C.'s reunification services for her two older children had been terminated on September 24, 2015 after she failed to reunify with them, and the Bureau believed she had "made minimal efforts to treat the problems that led to the removal of [her older children] and there is no evidence that giving additional time would make a significant impact."

T.C. was being provided one-hour, weekly, supervised visits with I.J. She had only missed three out of 18 scheduled visits, "mostly due" to miscommunication between T.C. and the Bureau. When the missed visit was T.C.'s fault, she communicated with the social worker. She was always on time or early for her visits and had appropriate and positive interactions with her daughter.

In its "assessment/evaluation," the Bureau summarized: "[T.C.] has had a traumatic life and the pattern of abuse that was begun for her as a child has been perpetuated into her adult years. As a child, she had little to no choice in the things that happened to her, including being molested and raped. As an adult, however, she has the power to choose differently, for herself and for her children.

7

As this point in her life, [T.C.] is not making wise choices—as is evident in the men she has chosen to have relationships and children with. All three of them have abused her and in the case of [one] father, she chose to marry him, even while he was incarcerated for the physical violence he inflicted upon her. In the year since her previous children . . . were removed from her, [T.C.] has not seemed to take the time to examine and remedy why she was involved with Children & Family Services. She has completed the services in her case plan, but there has been little reflection of it in her daily life; no evidence that she has learned from the situation or that she can provide safety for her children.

"This social worker has seen some progress, though, in that [T.C.] is actively trying to relocate so that [G.J.] can no longer show up at her home when he wants. She is working with her Housing Authority caseworker to move as quickly as possible. Additionally, [T.C.] has also requested a notarized letter from [G.J.'s] family to show that they contacted him and notified him of [T.C.'s] hospitalization and resulting birth of [I.J.]. This letter would directly address the allegation that she disobeyed her own restraining order to contact [G.J.] from the hospital regarding [I.J.]—which resulted in [I.J.] being detained. [T.C.] has remained steadfast in her admission of contacting his family and her denial of contacting him herself. [T.C.'s] therapist supports this side of the story and has stated that there have been some changes for the better in [T.C.] and that she is on a path to healing. This same therapist, however, admits to having no way of knowing how long that healing will take.

"In dealing with this social worker, [T.C.] has consistently been respectful, polite, well-mannered and openly communicative. The issue, as it stands, is that all of this progress has come too late and that it is not enough to ensure the safety, health and well-being of her children. [T.C.'s] penchant for choosing men that will perpetuate the abuse she has experienced throughout her life is of primary concern and [T.C.] has done very little to show that these choices will not continue, despite the time that she has been given."

8

**April 2016 Status Update**

On April 14, 2016, in light of the passage of time since its original disposition report, the Bureau provided the court with the following update:

"Since the Dispositional hearing on November 13, 2015, [T.C.] has had weekly supervised visits with [I.J.] . . . . In the month of November, [T.C.] made three out of five visits. In December, she made three out of four visits. In January, she made two out of four visits. In February, she made three out of five visits and in March, she made two out of three visits. Visits have been missed for a variety of reasons, including transportation, scheduling mix-ups, not confirming on time, no show, etc. At this point, [T.C.] is making about 60% of the scheduled visits . . . . The visits have gone well. [T.C.] has remained appropriate—interacting with [I.J.], feeding and changing her accordingly, bringing new clothes, reading to her, etc.

"Since the November hearing, it has been confirmed that while a temporary restraining order was put in place July 2015 by the Concord Police Department for [T.C.] and [G.J.], . . . [T.C.] failed to follow up to put a more permanent restraining order in place. This social worker sent a premises and records request to the Concord Police Department on December 7, 2015. According to the records faxed in accordance with that request, there have been no disturbances or domestic incidents reported since October 11, 2015 . . . .

" [T.C.] recently relocated and acquired a new cell phone number as well. According to [T.C.], the new apartment is a 2-bedroom, in anticipation of [I.J.'s] return and is prepared as such. In a conversation with this social worker on March 22, 2016, [T.C.] was assured that her new address could be kept confidential in future court reports in an effort to ensure that [G.J.] could not show up unannounced. [T.C.] explained, however, that she did not fear [G.J.] and was unconcerned about him having her new address. She explained that most of their interactions occurred through his family and not directly. [¶] . . . [¶]

9

"On March 22, 2016, this social worker sent an email to Lisa Slater, therapist for [T.C.]. As there was no response to the initial email, this social worker sent a follow up email on March 28, 2016, and Ms. Slater responded, saying that [T.C.] has continued therapy with her. Ms. Slater stated that [T.C.] attends regularly, that 'she has been and remains appropriately engaged in her treatment' and that [T.C.] had met her previous therapeutic goals, so they currently work on maintenance. Ms. Slater did not specify how often she met with [T.C.], nor what the treatment goals were in the past or might be currently. [¶] . . . [¶]

"The Bureau stands by its previous recommendation to terminate services to [T.C.] . . . ."[3]

### Contested Disposition Hearing

Social worker Tandrea Thysell was the only witness at the April 19, 2016 contested disposition hearing. She testified as follows:

T.C. was having weekly, supervised visitation at that time. Visit reports indicated that T.C. was appropriate in dealing with I.J., changing and feeding her. "Perhaps one or two" of the missed visits were due to the Bureau canceling the visit.

T.C. and G.J. were involved in a domestic violence incident on October 11, 2015. According to Ms. Thysell, as the October 11 incident was described in the police report, T.C. was at a friend's apartment when G.J. showed up with his current girlfriend. T.C. had gone to the apartment to have the friend mediate the situation between her and G.J. T.C. got into an argument first with the girlfriend and then with G.J., who kicked her in the chest and stomach. The friend who lived in the apartment held up a gun and told them to leave. T.C. was uncooperative with the police when they responded and rejected their offer of domestic violence

---

[3] The Bureau's statement that it was standing by its recommendation to *terminate* services was incorrect. T.C. had never been provided reunification services in this case, which was still at the disposition stage where the issue before the court was whether or not to order services.

10

assistance. G.J. later called her to taunt her about not having been arrested, and T.C. told him she was not the one who had called the police.

On December 7, 2015, Ms. Thysell requested a report on police contact at T.C.'s address. There were no reports of disturbances there since October 11. Despite that the disposition hearing did not occur until April 2016, Ms. Thysell did not check for any police contact at that address after December 7 or at a new address where T.C. moved in February 2016. Ms. Thysell was aware that T.C. had obtained two temporary restraining orders but had never followed through on obtaining a permanent restraining order.

Ms. Thysell had e-mailed therapist Slater, who responded that T.C. was seeing her weekly and was engaged in her therapy. According to Ms. Slater, T.C. had met her previous therapeutic goals so they were working on new goals. While Ms. Slater "wasn't really clear" about what those new goals were and what they were addressing, she indicated they were working on T.C.'s "behaviors and some of her impulsivity." Ms. Slater had mentioned to Ms. Thysell in the past that T.C. lived with PTSD and depression.

In closing argument, county counsel argued that T.C. had maintained a relationship with G.J. despite the violence between them and had never followed through on obtaining a permanent restraining order. Accordingly, "We're really in the exact same place we were back in the middle of last year . . . ." He continued, "[I]t's clear in this case that she's lost, that her reunification services were terminated for the two previous children. In order for her to overcome the bypass, she has to show by clear and convincing evidence that she has overcome the disability that caused her to lose those—to have the reunification services terminated on those other children. And the disability then was her domestic violence, in particular with [G.J.]. [¶] And what these reports indicate is that it's not changed. She hasn't really made any change. She's still going to see Ms. Slater, but apparently that therapy has not made any difference in her life because she continues the violent engagement with [G.J.]. And, you know, this police

11

report I think is pretty devastating to her, any argument that she could make that she's actually changed her life and that, therefore, she should be given services on this new child."

Counsel for T.C. argued that the police report on the October 11 incident did not say how the situation began. All it indicated was that T.C. went to the friend's place, and G.J. and a female showed up, and the friend attempted to mediate an argument. T.C. was then the victim of an ensuing altercation. And there were no reports of domestic violence since then. Instead, T.C. had relocated and kept her address confidential from G.J., and when they had encountered each other at the courthouse, there were no inappropriate interactions.

Counsel for I.J. believed bypass of services was appropriate, arguing there was "clear and convincing evidence for bypass in this case. Whatever may happen in the future, to date there has been a failure to reunify with those two other children. [¶] And I do not believe that there has been sufficient showing to assert that those obstacles have been overcome at this time that should obviate the need for the bypass."

The court then ruled:

"There's just too much violence here. There's just been too much violence. There's been violence in both other children who I've had . . . . And now we come again, more violence. I don't know what's going on because nobody's bothered to check in the last couple of months whether there's any police checks regarding mother.

"But when they've checked, they've found it. And I don't think she's made sufficient progress. And I'll tell you something that concerns me an awful lot. She's only made 60 percent of her visits. This is a young baby, 60 percent of the visits, and she was given so many opportunities. There's always an excuse. I read that. Always an excuse why she can't make the visits. And according to the testimony, only two were something to do with the Bureau. So I just don't find a suspicion of change of circumstances here.

12

"And I'm sorry, because actually [T.C.] is better in this hearing than she's ever been. It's just been the last part of the hearing that she can't control herself in talking and interrupting. But, frankly, she has been better. I do see a slight change in her. But I don't see a change that would warrant me risking the safety of her child and her choices of violent people and her own violent behavior, because I believe she was kind of part of that in the last police report."

With that, the court ordered that T.C. be denied reunification services and set a section 366.26 permanency hearing for August 9, 2016.

T.C. filed a timely notice of intent to file a petition for extraordinary writ, followed by a timely petition.

## DISCUSSION

Subdivision (a) of section 361.5 contains the general statutory mandate for the provision of reunification services in a dependency proceeding. It provides in pertinent part that "whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians." (§ 361.5, subd. (a); see also *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) Subdivision (b), however, identifies certain circumstances under which reunification services need not be offered. (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 739, 744; *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 597.) One such circumstance, set forth in subdivision (b)(10), is when "the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian." (§ 361.5, subd. (b)(10).) It has been said that this

13

calls for a two-prong analysis:  (1) whether the parent previously failed to reunify with the dependent child's sibling(s) or half sibling(s); and (2) whether the parent subsequently failed to make a reasonable effort to treat the problems that led to the removal of the sibling or half sibling(s).  (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96 (*Cheryl P.*); but see *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 194 [using a four-part analysis].)

The court here relied on section 361.5, subdivision (b)(10), to bypass reunification services for T.C., finding she had not sufficiently changed her circumstances.  T.C. challenges that finding, contending the evidence showed she had in fact made reasonable efforts to remedy the problems that led to the prior dependency proceedings.  We review the juvenile court's order for substantial evidence (*D.F. v. Superior Court* (2015) 242 Cal.App.4th 664, 669; *Cheryl P., supra,* 139 Cal.App.4th at p. 96), and we conclude substantial evidence is lacking here.

We begin our discussion with two preliminary observations.

First, T.C. contends the juvenile court applied the wrong burden of proof.  In support, she attributes to the court a passage from the dispositional hearing in which the speaker stated, "In order for her to overcome the bypass, she has to show by clear and convincing evidence that she has overcome the disability that caused her to lose those—to have the reunification services terminated on those other children."  As the reporter's transcript confirms, that statement was made by county counsel, not the court.  And counsel was incorrect, as the burden of proof when applying the section 361.5, subdivision (b), bypass provision is on the party seeking bypass—here, the Bureau—who must establish that the section applies by clear and convincing evidence.  (*In re L.S.* (2014) 230 Cal.App.4th 1183, 1193; *Cheryl P., supra,* 139 Cal.App.4th at p. 98.)  There is no evidence here the court incorrectly placed the burden of proof on T.C., and the court is presumed to have known and understood the applicable law.  (*People v. Braxton* (2004) 34 Cal.4th

14

798, 814; *Cardinal Health 301, Inc. v. Tyco Electronics Corp.* (2008) 169 Cal.App.4th 116, 155.)

Our second observation is that "the problems that led to removal" of I.J.'s half siblings (§ 361.5, subd. (b)(10)) are not entirely clear from the record. No documents from the prior proceedings, which are often the subject of a request for judicial notice below, are in the record before us. The Bureau's detention/ jurisdiction report represents that the allegations in that proceeding were general neglect and caretaker absence/incapacity, but the supporting facts alleged in those petitions are not before us.

Despite this, the Bureau and the juvenile court operated on the understanding that domestic violence was the problem that led to the removal of T.C.'s older children. And the Bureau focuses its opposition here on the same premise, arguing that "domestic violence was a substantial component of [T.C.'s] service plan in the half-sibling's case." Assuming for argument's sake that this is correct, we must ask whether there is substantial evidence supporting the court's finding by clear and convincing evidence that T.C. had not made a reasonable effort to address her history of engaging in abusive relationships. This question, we answer in the negative.

The timeline in this case bears note. On September 24, T.C.'s reunification services as to her older children were terminated. In its November 10 disposition report, the Bureau recommended bypass in this case because T.C. had not made sufficient efforts to remedy the problem that led to the removal of her older children. Since termination of services with respect to I.J.'s half siblings had occurred only six weeks earlier, T.C. had scarcely been afforded an opportunity to address the problem. In *Cheryl P., supra,* 139 Cal.App.4th at pp. 98–99, the court recognized that section 361.5, subdivision (b)(10)'s no-reasonable-efforts standard necessarily contemplates the passage of sufficient time to allow the parent an opportunity to improve his or her situation.

15

To a certain degree, however, this defect became moot due to the passage of time between the Bureau's November 10 bypass recommendation and the April 19 contested disposition hearing. This delay provided T.C. five additional months during which to make a reasonable effort to address her domestic violence issues. And, it appears from the record, she did.

In making its bypass order, the court stated multiple times that there had been "too much violence." But while there may have been "too much violence" in the past, there was no evidence T.C. continued to subject herself to abusive relationships. The last documented incident of domestic violence occurred on October 11, 2015. The disposition hearing occurred on April 19, 2016. There was thus no evidence that T.C. had been the victim of any abuse for the six months preceding the disposition hearing. Because the Bureau's last check for police contact occurred on December 7, 2015, we cannot know whether or not there were in fact altercations after that date. But it was the Bureau's burden to show a lack of reasonable efforts, and the absence of any evidence that T.C. was involved in an abusive situation in the six months leading up to the disposition hearing undermines this showing. Quite simply, given this six-month, apparently abuse-free period, county counsel's claim at the disposition hearing that T.C. "continues the violent engagement with [G.J.]" was specious.

The court's observation about T.C.'s recent abuse history failed to recognize this gap in the evidence. The court conceded that it did not "know what's going on because nobody's bothered to check in the last couple of months whether there's any police checks regarding mother," yet it went on to say that "when they've checked, they've found it." But what "they" had found occurred six months earlier.

In contrast to the lack of evidence of ongoing domestic violence, there was affirmative evidence that T.C. had made efforts to improve her situation. She had relocated to housing suitable for her and I.J. and had changed her telephone number. She had engaged in weekly individual therapy and achieved her initial

16

therapeutic goals, and was working toward additional goals. Her therapist reported that she had seen "some changes for the better" in T.C., who was "on a path to healing." The social worker described her as consistently "respectful, polite, well-mannered and openly communicative," suggesting an improvement over the "poor impulsivity and lack of judgment" alleged in the petition. The court likewise recognized her progress when it observed at the disposition hearing that T.C. was "better in this hearing than she's ever been."

In addition to its "too much violence" finding, the court expressed concern about T.C.'s visitation record: "She's only made 60 percent of her visits. This is a young baby, 60 percent of the visits, and she was given so many opportunities. There's always an excuse. I read that. Always an excuse why she can't make the visits. And according to the testimony, only two were something to do with the Bureau. So I just don't find a suspicion of change of circumstances here." We fail to understand what T.C.'s visitation record had to do with the court's determination under section 361.5, subdivision (b)(10). This was not a review hearing to assess her progress on a case plan; this was a disposition hearing at which the court was considering whether T.C. had made a reasonable effort to address the abusive situation that led to the removal of her older children.

There was much discussion at disposition about T.C.'s failure to obtain a permanent restraining order against G.J. But as case law instructs, "the 'reasonable effort to treat' standard" of subdivision (b)(10) "is not synonymous with 'cure.' " (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464.) Thus, for example, the "mere fact that [the mother] had not entirely abolished her drug problem would not preclude the court from determining that she had made reasonable efforts to treat it." (*Id.,* at p. 1464.) Accordingly, in order to be entitled to reunification services, T.C. was not required to take every conceivable step to address her domestic violence history. And certainly her failure to obtain a permanent restraining order standing alone was not substantial evidence to support the court's finding.

17

As we have stated, we cannot know whether T.C. was the victim of domestic violence in the six months leading up to the disposition hearing. The Bureau's failure to update its search for police contact at her addresses prior to the hearing was a significant oversight in this regard. But if domestic violence was the basis for the removal of I.J.'s half siblings, and there was no evidence of domestic violence in the six months before the dispositional hearing, we cannot conclude there is substantial evidence supporting the court's finding by clear and convincing evidence that T.C. had not made a reasonable effort to remedy the problems that necessitated the removal of her older children. Our conclusion is consistent with the goals of the dependency scheme. "[F]amily preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced." (*Renee J. v. Superior Court, supra,* 96 Cal.App.4th at p. 1464.) "If the evidence suggests that despite a parent's substantial history of misconduct with prior children, there is a reasonable basis to conclude that the relationship with the current child could be saved, the courts should always attempt to do so." (*Ibid.*)

## DISPOSITION

Let a writ issue directing respondent Superior Court of Contra Costa County to: (1) vacate its order denying reunification services to T.C. and setting the matter for a section 366.26 permanency planning hearing; and (2) issue a new order directing the Bureau to provide six months of services to T.C.

Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


A148248; *T.C. v. Superior Court*

19